RENDERED: NOVEMBER 2, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2016-SC-000287-MR DATE 11/27/17 Kim Redmon, DC

COLE D. ROSS                 APPELLANT

ON APPEAL FROM GRAVES CIRCUIT COURT
V.          HONORABLE TIMOTHY C. STARK, JUDGE
NO. 10-CR-00272

COMMONWEALTH OF KENTUCKY           APPELLEE

## OPINION OF THE COURT BY JUSTICE VENTERS

### AFFIRMING

Appellant, Cole Douglas Ross, appeals from a judgment of the Graves

Circuit Court convicting him of murder and first-degree arson, and sentencing

him to two concurrent terms of life imprisonment. On appeal, Appellant

contends that his convictions must be reversed because (1) he was entitled to a

directed verdict based upon the "inherent unbelievability" of the

Commonwealth's principal witness, Tonya Simmons; (2) the trial court erred by

denying his motion for a mistrial; and (3) the prosecutor engaged in

impermissible closing argument. For the reasons explained below, we affirm

the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was indicted for the murder of Keith Colston and first-degree arson relating to the burning of the Colston residence. His first trial ended with a hung jury. Upon retrial, he was convicted and sentenced to life imprisonment. On appellate review, this Court reversed the convictions and remanded the case for a third trial. *See Ross v. Commonwealth*, 2015 WL 737573 (Ky. 2015).[1]

Upon remand, evidence presented at the third trial included the following facts. Appellant was in a romantic relationship with a married woman named Tonya Simmons. Tonya lived with Appellant until he lost his job and his home. At that point, Tonya returned to live with her husband and children while Appellant moved into a spare room at the residence of his friends, Lisa and Keith Colston. Keith had recently undergone hip surgery and still had difficulty getting around. He also suffered from a respiratory condition that occasionally required him to rely upon an oxygen tank.

On the day of Keith Colston's death, Lisa left the residence early in the morning to go to work. Appellant spent much of the morning running errands with Tonya and her two small grandchildren. According to Tonya, they made several stops before she returned Appellant to the Colston residence. The time of their return is disputed. Tonya testified that she got Appellant back to the

---

[1] The reversal was based upon a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The prosecutor admitted that during jury selection he was intentionally attempting to exclude women from the jury because he believed that women jurors would be less likely than men to believe the Commonwealth's main witness.

2

residence at 10:00 a.m., but a store receipt indicated that she was still running errands at 11:15 a.m. Tonya testified that when she returned Appellant to the Colston residence, he asked her to go buy some beer for him, and she did so. A receipt from a nearby store showed that Tonya purchased beer and other items at 12:54 p.m. Tonya testified that when she returned with the beer, the trunk of Appellant's car was open and various items belonging to him were packed inside. As she walked to the back door, she saw flames inside and she heard Keith inside calling for help. Tonya testified that Appellant came to the back door, pushed her away, and assured her that he would help Keith.

Tonya then returned to the front of the residence, and from that vantage point, she saw Appellant pick up two bottles of charcoal lighter fluid from the front porch and take them into the burning residence. Keith was still calling for help. Tonya called 911 to report the fire; her call was logged in at 1:14 p.m. She testified that Appellant then emerged from the burning residence, got into his car, and drove away before emergency responders arrived.

Instead of remaining at the scene to tell responders what she had seen, Tonya testified that she had to pick up her sister and her niece at a local hospital so she, too, left the scene of the crime she claimed to have witnessed. Despite numerous opportunities, Tonya did not report what she saw until three days later, when she told her story to police. Tonya testified that she intended to contact police sooner but was unable to do so because Appellant was watching to ensure she did not contact the police.

3

Appellant's version of events differed significantly from Tonya's. According to his statement to investigators, he last saw Keith around eight or nine on the morning of the fire when he left to run errands with Tonya. He testified that he, not Tonya, bought the beer and that he did so at 1:41 p.m. Appellant claimed he first learned about the fire when Lisa Colston contacted him with the news later that afternoon. He then went to Lisa's grandmother's home to console Lisa and other family members who gathered there after learning that Keith's body was found in the charred remains of the home. Appellant returned to the scene with Lisa to talk to investigators.

Colston's severely burned body was found lying face up in the hallway of the home. Expert testimony suggested that this body position was inconsistent with death by smoke inhalation because most smoke inhalation victims are found in a face-down position. Evidence also indicated that the carbon monoxide level in Colston's body at the time of death was too low to be fatal absent other contributing circumstances. Samples of the unburned carpet and subflooring from beneath Colston's body indicated the presence of "medium petroleum distillates." Charcoal lighter fluid is classified as a medium petroleum distillate. The scientific evidence accordingly indicated that Colston burned to death and that the fire was deliberately set.

At the conclusion of the third trial, Appellant was again convicted and sentenced to life imprisonment. This appeal followed.

4

## II. APPELLANT WAS NOT ENTITLED TO A DIRECTED VERDICT BASED UPON INHERENTLY UNBELIEVABLE TESTIMONY

Appellant first contends that he was entitled to a directed verdict acquitting him of both charges. A defendant is entitled to a directed verdict of acquittal when, after all fair and reasonable inferences from the evidence are drawn in favor of the Commonwealth, the evidence is insufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

Appellant does not dispute that the evidence, when taken at face value and viewed in the light most favorable to the Commonwealth, satisfies the *Benham* standard. He notes, however, that the sufficiency of the evidence to convict him depends entirely upon Tonya's claim to have been an eyewitness to his involvement in the crimes, and that without her critical testimony, the evidentiary calculus shifts to insufficiency under the *Benham* standard. He contends that Tonya, the only witness linking him to the crime, was so utterly incredible and untrustworthy as a witness that all of her uncorroborated testimony was unworthy of belief as a matter of law and should have been disregarded in the directed verdict analysis.

Appellant bases his characterization of Tonya's credibility upon her demeanor at trial, the inconsistencies in her testimony at the three trials, and the inconsistencies in her third-trial testimony and other, more credible evidence. He also notes that Tonya's words were often "slurred and mumbled." He directs our attention to the fact several times as she testified, she had to be reminded to speak clearly and into the microphone. He notes that she had

5

difficulty remembering facts, despite it being her third time to testify at a trial on the subject, and that the prosecutor frequently had to prompt her with leading questions to which Appellant's objections were sustained. He also notes that defense counsel began his cross-examination of Tonya by asking her if she was thinking clearly and if she had anything to drink that day. Tonya denied that she had been drinking or taking intoxicants. Appellant also reminds us that Tonya claimed no knowledge of the crime for three days.

Our review of the record compels us to agree that Tonya lacked many of the qualities commonly associated with credibility and that she modeled many of the flaws identified by Appellant. Appellant correctly cites authority which recognizes that, in exceptional circumstances, a witness's testimony may be so improbable and implausible that it must be disregarded as having absolutely no probative value as a matter of law.

However, upon examination of those authorities, we conclude that such exceptional circumstances do not arise because a particular witness is so lacking in the objective indicators of trustworthiness as to remove from her testimony all vestiges of credibility. The exceptional circumstances, which have authorized the unusual measure advocated by Appellant, arise when the substance of the testimony, detached from the personal credibility of the witness who bears it, is so laden with doubt and implausibility that it cannot rationally be regarded as a fact capable of supporting a verdict. "It is only where the testimony is so incredible *on its face* as to require its rejection as a matter of law that the jury will not be permitted to consider it." *Daulton v.*

6

*Commonwealth*, 220 S.W.2d 109, 110 (Ky. 1949) (emphasis added). As the applicable cases illustrate, it is the inherent lack of probative value in the testimony itself, not the witness's lack of credibility, that allows the court to disregard it.

The point is clearly illustrated by a case cited by Appellant, *Coney Island Co. v. Brown*, 162 S.W.2d 785 (Ky. 1942), in which our predecessor court reversed a judgment after concluding that the verdict rested upon evidence that was not worthy of belief. The plaintiff in *Coney Island* testified that the riverboat upon which she was a passenger started into motion with a sudden jerk, which caused her to fall. The appellate court concluded, however, that it was not possible under the "laws of physics and mechanics" for a paddlewheel riverboat to suddenly lurch forward as described by the plaintiff. The Court explained:

> It is, to be sure, ordinarily the function of a jury to determine the weight and effectiveness of the evidence. But . . . the jury may not . . . base its verdict upon a statement as to what occurred or how something happened when it is opposed to the laws of nature or is clearly in conflict with the scientific principles, or base its verdict upon testimony that is so incredible and improbable and contrary to common observation and experience as to be manifestly without probative value.

*Id.* at 787–88 (citations omitted).

Similarly, in *Louisville & N.R. Co. v. Chambers*, 178 S.W. 1041 (Ky. 1915), a plaintiff claimed that she was injured by the violent force of a train wreck near her home. The court determined that the plaintiff's description of being thrown from her bed and onto a rocking chair was "inherently impossible; there

7

was no force there present and operating upon her which could have produced such a result; and her testimony in that respect is impeached by all the physical facts, concerning which there is and can be no dispute." *Id.* at 1042.

> It is undoubtedly well settled in this jurisdiction that the credibility of witnesses is for the jury; that upon a motion for a directed verdict the evidence for the adverse party must be taken as true, and every reasonable inference fairly deducible therefrom must be indulged; . . . . Of necessity, these rules cannot apply where the only evidence upon which such adverse party rests his right to succeed consists of a statement of alleged facts, inherently impossible and absolutely at variance with well-established and universally recognized physical laws.

*Id.* at 1043.

Appellant also relies upon *Davis v. Commonwealth*, 162 S.W.2d 778 (Ky. 1942), but we find that case, too, fails to support his argument. In *Davis*, the Court did not strike or disregard testimony it deemed to be incredible. Instead, it did the opposite. The court determined that the jury had disregarded the unimpeached evidence of the defendant's "almost conclusively established" alibi, and so it set aside the jury's verdict as being "against the weight of the evidence." The case was remanded for a new trial in which a "fuller development of the facts so that the guilt of the accused, if he is guilty, may be more certainly determined." *Id.* at 780.

We summarize the rule in this way: testimony admitted into evidence must be disregarded during the directed verdict analysis when the substance of that testimony is so extraordinarily implausible or inherently impossible as to render it manifestly without probative value or patently unworthy of belief. The

8

rule is not, as Appellant posits, that testimony admitted into evidence must be disregarded due to the witness's extraordinary lack of credibility as demonstrated by the usual manifestations of untrustworthiness.

Tonya's lack of credibility could have induced a jury to disbelieve her, but it did not render the substance of her testimony "inherently impossible and absolutely at variance with well-established and universally recognized physical laws."[2] Unlike the testimony in *Coney Island* alleging the abrupt lurch into motion of a paddlewheel riverboat, the conduct Tonya attributed to Appellant was not so "contrary to common observation and experience as to be manifestly without probative value;"[3] nor was her testimony in conflict with "almost certainly established" facts like the alibi in *Davis*.

Appellant gives us plenty of reasons to disbelieve Tonya, but the substance of her testimony describing Appellant's role in the crime is not so extraordinarily implausible or inherently impossible that it is manifestly without probative value or patently unworthy of belief; it could have happened as she testified. Consequently, we conclude that the credibility and weight to be given to Tonya's testimony remained within the province of the jury, and therefore, was necessarily included in the body of evidence to be considered when deciding whether a directed verdict was proper.

Appellant's argument on this issue treads very closely to the evidentiary boundary that distinguishes the *credibility* of a witness from the *competence* of

---

[2]*Chambers*, 178 S.W. at 1043.

[3] *Coney Island*, 162 S.W.2d at 788.

9

a witness. Credibility relates to the witness's truthfulness and the weight placed upon that witness's testimony relative to other evidence. Assessing the credibility of a witness and the weight given to her testimony rests "within the unique province of the jury [or finder-of-fact]." *McDaniel v. Commonwealth,* 415 S.W.3d 643, 654 (Ky. 2013). Competence, however, relates to the qualifications of a person to appear as a witness and testify in a trial or hearing. *See* KRE 601.[4] "It is within the sound discretion of the trial court to determine whether a witness is competent to testify." *Bart v. Commonwealth,* 951 S.W.2d 576, 579 (Ky. 1997) (citation omitted).

Striking Tonya's testimony because of her apparent or perceived untrustworthiness borders very closely upon declaring her incompetent to testify in violation of KRE 601. It also improperly shifts the credibility determination from the jury to the judge. As cautioned by Professor Lawson, the power to disqualify witnesses "should be applied grudgingly, only against the 'incapable' witness and never against the 'incredible' witness, since the

---

[4] KRE 601 states:

(a) General. Every person is competent to be a witness except as otherwise provided in these rules or by statute.

(b) Minimal qualifications. A person is disqualified to testify as a witness if the trial court determines that he:

(1) Lacked the capacity to perceive accurately the matters about which he proposes to testify;

(2) Lacks the capacity to recollect facts;

(3) Lacks the capacity to express himself so as to be understood, either directly or through an interpreter; or

(4) Lacks the capacity to understand the obligation of a witness to tell the truth.

10

triers of fact are particularly adept at judging credibility." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 3.00[2][b] at 239 (5th ed. 2013) (quoting the Evidence Rules Study Committee, Kentucky Rules of Evidence—Final Draft, p. 54 (Nov. 1989)).

In summary, we are confident that whatever deficiencies existed to detract from Tonya's credibility, her testimony was correctly entrusted to the jury, rather than trial court. We reject Appellant's argument that Tonya's testimony should have been, in effect, stricken from the record as inherently unreliable, and conclude that Appellant was not entitled to a directed verdict.

## III. NEWS REPORT ABOUT THE TRIAL DID NOT WARRANT A MISTRIAL

After the swearing of the jury but before the presentation of any evidence, Appellant requested a mistrial based upon a news report about the trial broadcast by a television station the night before. The broadcast included an interview with the prosecutor informing viewers that he was "frustrated" because Appellant's previous trial for these offenses was reversed on appeal due to a violation of jury selection rules, and that "all of the evidence was good. [The appellate court] upheld every bit of the evidence."

The jury had been previously admonished to avoid any news accounts about the trial. We presume jurors follow the admonitions of the trial court. *Tamme v. Commonwealth*, 973 S.W.2d 13, 26 (Ky. 1998). When asked if they had watched the previous evening's news broadcast, many jurors indicated that they generally watched television news, but none admitted to having seen

11

that particular broadcast. Near the conclusion of the trial, the trial court again asked the jurors whether they had seen any media coverage of the trial. All jurors indicated that they had not.

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (quoting *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907)). News coverage of criminal trials, as in the *Sheppard* case, can be a disruptive and prejudicial impediment to a fair trial, but we also recognize that the news media plays a valuable and important role in our legal system, as reflected in the constitutional right to an open and public trial.[5] "The press does not simply publish information about trials but [also] guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." 384 U.S. at 350. Appellant refers to the news report as "improper" but we see nothing "improper" about the television station informing the public about the ongoing trial proceedings. Nevertheless, a juror's disobedience to the trial court's admonition would be improper, as would proceeding to try the case after jurors had been improperly influenced by a news account. But that did not happen here.

---

[5] United States Constitution, Amendment VI: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."; Kentucky Constitution, Section 11: "In all criminal prosecutions the accused . . . shall have a speedy public trial by an impartial jury of the vicinage . . . ."

12

We have held in connection with a jury's possible exposure to press reports about a case that "the mere fact that jurors may have heard, talked, or read about a case" does not require a change of venue "absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant. . . . Prejudice must be shown unless it may be clearly implied in a given case from the totality of the circumstances." *Brewster v. Commonwealth*, 568 S.W.2d 232, 235 (Ky. 1978).[6] *Brewster* further notes that "a showing of actual prejudice is unnecessary if the procedure involves such a probability that prejudice will result that it is deemed inherently lacking in due process." 568 S.W.2d at 235 (citing *Estes v. Texas*, 381 U.S. 532 (1965)).

Appellant has failed to demonstrate any prejudice arising from the broadcast. All jurors indicated that they had not seen the report, and therefore, no prejudice could possibly arise from it. In order for a trial judge to grant a mistrial the record must reveal a manifest necessity for such an action or an urgent or real necessity. *Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky. 1985) (citations omitted).[7] Absent actual prejudice, we conclude that the trial court properly declined Appellant's request to declare a mistrial.

---

[6] *Brewster* addressed the issue in the context of a change of venue motion, but the same concern of prejudice arising from exposure to news reports is present here.

[7] Vacated in part by *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000).

## IV. THE TRIAL COURT PROPERLY ADDRESSED THE PROSECUTOR'S IMPROPER COMMENT IN CLOSING ARGUMENT

Finally, we address Appellant claim that his convictions should be reversed because the prosecutor made the following comment in his closing argument suggesting that by imposing a life sentence, the jury could control "how Graves County feels about these type of crimes." Appellant objected to the statement and the trial court sustained his objection and admonished the jury to disregard the statement. Appellant requested no other relief.

Since the trial court granted Appellant all that he requested, there is no error for us to review. The prosecutor's comment was, as reflected by the trial court's ruling, improper, but we presume that jurors heed the admonitions of the trial court. *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky. 2003). Therefore, any prejudicial effect of the improper comment was rendered harmless.

However, even if we assume that the trial court should have gone further to eliminate any possible prejudice from the comment, we are satisfied upon review that manifest injustice required for reversal under the substantial error rule, RCr 10.26, did not occur. Appellant is entitled no other relief on this issue.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Graves Circuit Court.

All sitting. All concur.

14

COUNSEL FOR APPELLANT:

Linda Roberts Horsman
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General

15