RENDERED:  MARCH 6, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0202-MR

CAMERON SHERLOCK                                        APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.        HONORABLE LUCY ANNE VANMETER, JUDGE
ACTION NO. 23-CR-00474

COMMONWEALTH OF KENTUCKY                              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; CETRULO AND L. JONES, JUDGES.

THOMPSON, CHIEF JUDGE:  Cameron Sherlock has appealed from the final

judgment of the Fayette Circuit Court adjudging him guilty of second-degree

strangulation[1] and for being a second-degree Persistent Felony Offender (PFO II)[2]

and sentencing him to an enhanced six-year sentence.  The issues on appeal

---

[1] Kentucky Revised Statutes (KRS) 508.175.

[2] KRS 532.080(2).

generally address inconsistent testimony from the victim and the detective assigned to the case. Sherlock also contests the constitutionality of the strangulation statute under which he was convicted. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

In May of 2023, Sherlock was indicted by the Fayette County grand jury and charged with first-degree strangulation[3] and for being a PFO II (he had been convicted of assault under extreme emotional disturbance in Clark Circuit Court in August 2022). The strangulation charge arose from an incident at his residence on September 11, 2022, during his 15-year-old son's birthday party. While playing pool, Sherlock got into an altercation with one of the party guests (the victim) about a pool stick, which escalated into the two pushing each other. The incident ended when Sherlock allegedly placed his hand around the victim's neck and impeded his ability to breathe for ten to twenty seconds. Sherlock entered a plea of not guilty and a jury trial was scheduled for August of 2024.

At trial, the Commonwealth introduced evidence from the victim, other party attendees who witnessed the incident, a school resource officer, the detective assigned to the case, and an expert witness. Sherlock introduced evidence from his son and another expert witness. The victim described the altercation between him and Sherlock, which involved the victim pushing Sherlock

---

[3] KRS 508.170.

to the ground and the wall, and Sherlock ripping his shirt and placing one hand around his neck and squeezing. The victim said he could not breathe for ten to twenty seconds and was scared, but he did not hyperventilate or pass out. One friend helped to get Sherlock off him, and another friend held Sherlock back when he tried to get back to the victim. The victim left the house and called his mother, and his stepfather picked him up. The victim denied being in any pain, but he reported that he had a headache, his chest hurt, and he was coughing the next day.

When he went to school on Monday, the victim was interviewed by the school resource officer, Sgt. Brittany Whitcomb. During his cross-examination at trial, the victim was asked to describe what he told Sgt. Whitcomb about how Sherlock touched him. The victim said he did not remember if he told her that Sherlock squeezed his neck. Defense counsel played the video of the interview when the victim was asked this question. The video showed the victim stating that he had not given Sherlock a chance to squeeze his neck. He said it felt uncomfortable and pushed him off. On redirect examination, the victim confirmed that Sherlock had squeezed his neck. He went on to say that he had gotten his words mixed up in the school interview. He explained that it was his first interview and that he had not had time to think back on that night because he did not want to. He said Sherlock squeezed his neck, it was uncomfortable, and he

could not breathe. He did not recall anyone asking him if he could breathe during the school interview.

Detective Barbara Baker of the Louisville Police Department's special victims unit testified about her investigation. She testified that she reviewed the police report and bodycam footage from the victim's interview at school; interviews with the social worker, the school resource officer, the witnesses at the party, the victim, and Sherlock. She also set up a forensic interview for the victim. During her testimony, the Commonwealth played the recording of her interview with Sherlock for the jury. In the interview, Sherlock described the incident as a 15-year-old's birthday party that got out of control. Sherlock said the victim was aggressive with him and pushed him into the pool table. He then grabbed the victim by the shirt and was going to take him out the back door to get him out of the house. Sherlock said he had been injured by the boy. Sherlock denied reaching for the victim's neck and said he pulled the victim's shirt at the shoulder. He said he would never hurt any of the kids. He just wanted the victim out of the house after the victim pushed him to the ground.

Det. Baker ultimately cited Sherlock for first-degree strangulation. Based on watching the victim's interview at school two days after the event and the forensic interview, which was ultimately consistent with his trial testimony, she determined that an assault occurred at Sherlock's house and that the victim had

-4-

been strangled by Sherlock. She also testified about the victim's interviews and her testimony to the grand jury about his statements regarding the altercation. Det. Baker explained that, considering the totality of the interviews, she believed the victim's answers as to how Sherlock put his hands on him were consistent, although she agreed that he did not say the same things in both interviews. She did not tell the grand jury that the victim had made inconsistent statements, instead she told the grand jury that the interviews were the same. She went on to state that the forensic interview is used to elicit the most honest response and that the forensic interviewer is trained to interview juveniles. The victim had not been asked if he could breathe in the school interview.

Dr. Jacqueline Sugarman testified as an expert witness regarding her examination of the victim on September 22, 2022, and her conclusion that he had been strangled. The victim said he had been choked, although his physical examination was normal. Given the amount of time that had passed since the incident, she was not expecting to find any injury at the time of her examination ten days after the incident. She said that injuries resolve pretty quickly and that the victim had very dark skin, making it harder to appreciate any type of bruising.

At the close of the Commonwealth's case, Sherlock moved for a directed verdict based on the inconsistencies between the victim's statements and Det. Baker's admission that she gave untruthful statements before the grand jury.

The Commonwealth contended that the jury could infer from the victim's statements that Sherlock had put pressure on his neck, and that, while the detective used the word "strangled" in the grand jury and the preliminary hearing, she did not discuss squeezing versus pressure. The court agreed that there were inconsistent statements, and it noted that the witnesses also remembered different things and were inconsistent. However, the court held that based on the directed verdict standard, there was enough evidence to go to the jury on credibility.

For his case-in-chief, Sherlock introduced testimony from a forensic medical examiner, Dr. George Nichols II, who did not believe a strangulation occurred based upon his review of the records that established there was no evidence of any injury. Sherlock's son testified about what he witnessed during the incident, which involved Sherlock and the victim pushing each other and Sherlock grabbing the victim in the chest area.

At the close of his evidence, Sherlock renewed his motion for a directed verdict on the same basis. The court denied the motion for the reasons stated earlier.

The circuit court instructed the jury on both first-degree and second-degree strangulation, and the jury ultimately found Sherlock guilty of second-degree strangulation and of being a PFO II. It recommended a sentence of three years on the strangulation conviction, enhanced to six years by the PFO II

conviction.  The court entered a verdict and judgment on August 15, 2024, memorializing and accepting the jury's verdict and recommended sentence.  A sentencing hearing was scheduled for October, prior to which Sherlock moved the court to consider probating his sentence.  The court declined to do so and sentenced Sherlock to six-years' imprisonment in the final judgment entered November 18, 2024.

Sherlock then moved the court to vacate the final judgment pursuant to Kentucky Rules of Civil Procedure (CR) 59.05.  In his motion, Sherlock asserted that Det. Baker committed perjury, that the verdict and judgment were not based upon substantial evidence but rather on the impeached testimony of the victim, and that KRS 508.175 violated the constitutions of the United States and Kentucky.  The Commonwealth disputed Sherlock's arguments, and the circuit court denied the motion in an opinion and order entered January 15, 2025.  This appeal now follows.

## ANALYSIS

On appeal, Sherlock continues to argue that the court should have granted a directed verdict or granted his CR 59.05 motion[4] due to 1) Det. Baker's

---

[4] "[T]here is no appeal from the *denial* of a CR 59.05 motion.  The denial does not alter the judgment.  Accordingly, the appeal is from the underlying judgment, not the denial of the CR 59.05 motion." *Ford v. Ford*, 578 S.W.3d 356, 366 (Ky. App. 2019) (emphasis in original). Here, we will treat this appeal as Sherlock attacking his conviction, not the CR 59.05 motion specifically.

false, misleading, or perjured testimony and 2) the lack of substantial evidence to sustain the verdict. He also continues to argue that KRS 508.175 is unconstitutional as vague and subjects him to cruel and unusual punishment.

We shall first consider whether Sherlock was entitled to a directed verdict.

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citation omitted). "A reviewing court does not reevaluate the proof because its only function is to consider the decision of the trial judge in light of the proof presented." *Id.* "Circumstantial evidence is sufficient to support a criminal conviction as long as the evidence taken as a whole shows that it was not clearly unreasonable for the jury to find guilt." *Bussell v. Commonwealth*, 882 S.W.2d 111, 114 (Ky. 1994)

(citing *Trowel v. Commonwealth*, 550 S.W.2d 530 (Ky. 1977); *Benham*, 816 S.W.2d at 187).  In addition, "[o]ur law has consistently held that uncorroborated testimony of an accomplice or a victim is enough to support a conviction."  *Taylor v. Commonwealth*, 671 S.W.3d 36, 43 (Ky. 2023) (citation omitted).

In order to establish a strangulation charge in this case, the Commonwealth has to establish that Sherlock "without consent, intentionally [or wantonly] impede[d] the normal breathing or circulation of the blood of another person by: (a) Applying pressure on the throat or neck . . . or (b) Blocking the nose or mouth of the other person."  KRS 508.170 and KRS 508.175.

For his first argument, Sherlock argues that Det. Baker's "false, misleading and perjured" testimony during her preliminary hearing, grand jury, and trial appearances that the victim's statements were consistent created a manifest error in the verdict.  We reject Sherlock's argument for the reasons set forth in the circuit court's order denying CR 59.05 relief:

> The Court concludes [Sherlock] has failed to establish that Det. Baker gave "perjured" testimony.  But even assuming [he] could make this showing, . . . [Sherlock] must demonstrate that there exists a reasonable certainty that had the truth been presented at trial—i.e., that the victim's statements were inconsistent—it would have changed the verdict. [Sherlock's] argument is fatally flawed because the prior inconsistent statement of the victim was played for the jury.  The jury had all the information available to them. The Court concludes [Det.] Baker's opinion regarding whether the two statements are consistent or inconsistent

-9-

is simply not relevant where the jury could hear both statements for themselves and make their own determination. The Court further concludes [Sherlock] has failed to establish manifest injustice or any manifest error of law or fact upon which the judgment is based.

As to the portion of Sherlock's argument specifically related to Det. Baker's grand jury testimony, we agree with the circuit court's reliance upon *Commonwealth v. Baker*, 11 S.W.3d 585, 588 (Ky. App. 2000), in which this Court held:

> Courts are extremely reluctant to scrutinize grand jury proceedings as there is a strong presumption of regularity that attaches to such proceedings. Ordinarily, courts should not attempt to scrutinize the quality or sufficiency of the evidence presented to the grand jury. "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."
>
> However, in *Bank of Nova Scotia v. United States*, [487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988),] the United States Supreme Court recognized the federal court's inherent supervisory authority to dismiss an indictment based on nonconstitutional irregularities, including prosecutorial misconduct occurring before a grand jury. "Under this standard, dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."
>
> Generally, a defendant must demonstrate a flagrant abuse of the grand jury process that resulted in both actual prejudice and deprived the grand jury of autonomous and unbiased judgment. A court may utilize

-10-

> its supervisory power to dismiss an indictment where a prosecutor knowingly or intentionally presents false, misleading or perjured testimony to the grand jury that results in actual prejudice to the defendant.

(Footnotes and citations omitted.)

We agree with the circuit court's conclusion that Sherlock should not have waited until after he was convicted to raise the issue of Det. Baker's grand jury testimony. We also agree with the circuit court's rejection of Sherlock's assertion that the grand jury would not have returned an indictment based upon probable cause "when the jury, having *all* the information before it, including the victim's prior inconsistent statement – determined [Sherlock] was guilty beyond a reasonable doubt."

For his second argument, Sherlock argues that the jury verdict was supported only by the impeached evidence of the victim, not by substantial evidence. Again, we disagree.

In *Saxton v. Commonwealth*, 671 S.W.3d 1 (Ky. 2022), this Court reviewed the denial of a motion for directed verdict on a strangulation charge, holding that inconsistent statements goes to a witness's credibility, not the sufficiency of the evidence.

> As to the strangulation charge, we first note that Saxton's brief is filled with alleged inconsistencies in Robinson's account of the attack. But inconsistency goes to credibility of a witness, and credibility determinations are the prerogative of the jury. *Ross v. Commonwealth*,

-11-

531 S.W.3d 471, 476 (Ky. 2017). The jury believed her testimony that Saxton did strangle her by grabbing her throat with his hand and by placing her in a headlock with his forearm to her throat. In the first instance she testified she could not breathe or struggled to breathe, and the second instance she testified she thought she would pass out.

. . . Saxton's testimony that she could not breathe and that she felt she would pass out as a result of Saxton squeezing her neck with his hand and forearm easily satisfies the elements required by law thus, we find no error in the trial court's refusal to grant a directed verdict as a matter of law. Moreover, the trial court was required to take Robinson's account as true. Therefore, under the evidence as a whole, it was not clearly unreasonable for the jury to find guilt.

*Saxton*, 671 S.W.3d at 10-11.

The same holds true in the present case. Construing the evidence in favor of the Commonwealth, the circuit court properly permitted the strangulation charge to go to the jury to consider the credibility of the witnesses. Counsel for Sherlock was able to thoroughly cross-examine the witnesses regarding the inconsistencies in the victim's statements and later testimony, as well as the inconsistencies in Det. Baker's testimonies. Further, the jury simply found the victim's testimony, in conjunction with the testimony from other witnesses, to be credible in returning a conviction.

For these reasons, the circuit court did not commit any error in denying Sherlock's motion for a directed verdict and the evidence supported the

-12-

jury's verdict. The victim and other witnesses to the incident testified that Sherlock placed a hand (or hands) around the victim's neck. While the victim originally said during his initial statement a few days after the incident that Sherlock had not squeezed his neck, the victim testified at trial that Sherlock had done so and that he could not breathe for ten to twenty seconds. The victim explained that he had mixed up his words and was processing what had happened at the time of his initial statement. Under the evidence presented, it was not clearly unreasonable for the jury to find Sherlock guilty and there was no manifest error of the law that would support a reversal.

Sherlock's next argument on appeal is that KRS 508.175 is unconstitutionally vague. The Commonwealth argues that Sherlock did not properly preserve this argument pursuant to KRS 418.075(1), which provides:

> In any proceeding which involves the validity of a statute, the Attorney General of the state shall, before judgment is entered, be served with a copy of the petition, and shall be entitled to be heard, and if the ordinance or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the petition and be entitled to be heard.

This notice is mandatory, and a party must strictly comply with the requirements:

> We have made plain that strict compliance with the notification provisions of KRS 418.075 is mandatory[,] meaning that even in criminal cases, we have refused to address arguments that a statute is unconstitutional unless the notice provisions of KRS 418.075 had been fully satisfied.

In the case at hand, Benet admits that he did not notify the Attorney General of his constitutional challenge during the pendency of the circuit court proceedings. Thus, Benet has failed fully and timely to comply with the strict rubric of KRS 418.075, leaving his constitutional challenge unpreserved for our review. Because the plain language of KRS 418.075 requires notice be given to the Attorney General prior to the entry of judgment, we reject any contention that merely filing an appellate brief, which necessarily occurs post-judgment, satisfies the clear requirements of KRS 418.075.

*Benet v. Commonwealth*, 253 S.W.3d 528, 532 (Ky. 2008) (footnotes and citations omitted).

The Commonwealth asserts that Sherlock failed to raise his constitutional argument or notify the Attorney General until he filed his CR 59.05 motion, which occurred after the entry of the judgment; therefore, he failed to comply with the notice requirements of KRS 418.075(1).

In his reply brief, Sherlock argues that he did not have standing to raise the constitutional argument until after he was convicted and sentenced:

Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of [the legislature] unless obliged to do so in the proper performance of our judicial function . . . . As a threshold matter, Kentucky courts do not have constitutional jurisdiction to adjudicate a question raised by a litigant who does not have standing to have the issue decided. Because the Appellees have yet to be adjudicated guilty and the Commonwealth's power to punish has yet to be invoked,

-14-

> we conclude the question whether Kentucky's death
> penalty is unconstitutional as to the age-based group
> identified by Appellees is currently not justiciable.

*Commonwealth v. Bredhold*, 599 S.W.3d 409, 414 (Ky. 2020) (internal quotation marks and citations omitted). He also argues that the judgment became interlocutory when he filed the CR 59.05 motion; therefore, he contends that he complied with KRS 418.075(1).

We agree with the Commonwealth that Sherlock failed to strictly comply with KRS 418.075 by neither raising this constitutional argument nor serving the Attorney General prior to the entry of the judgment. The circuit court entered the judgment on November 18, 2024, and Sherlock did not file his CR 59.05 motion, where he first raised the constitutional argument, until November 26, 2024; therefore, we must hold that, pursuant to *Benet*, *supra*, Sherlock did not properly preserve his constitutional argument, and we decline to address it.

## CONCLUSION

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.

-15-

BRIEFS FOR APPELLANT:

J. Ross Stinetorf
Lexington, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Sarah Benedict
Assistant Solicitor General
Frankfort, Kentucky