# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: AUGUST 24, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0099-MR

DAVID WILLIAMS
                                                                    APPELLANT


V.
ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JEFFREY A. TAYLOR, JUDGE
NO. 19-CR-01072-001


COMMONWEALTH OF KENTUCKY
                                                                    APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, VACATING IN PART, AND REMANDING**


A Fayette County jury convicted David Williams of murder, trafficking in a controlled substance, and tampering with physical evidence. Williams was sentenced to a total of thirty-five (35) years in prison. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the judgment of the Fayette Circuit Court in part, vacate in part, and remand.

## I.  BACKGROUND

On July 2, 2019, at approximately 12:50 p.m., Lexington Police dispatch began to receive 911 calls regarding a man who had been shot at the Coolavin Apartments. When first responders arrived at the scene, they found Quatrell Kimble lying on the steps of building D. Kimble was transported by ambulance to the University of Kentucky Hospital where he was pronounced dead. He

suffered four gunshot wounds, one on his left arm, lower left back, left buttock, and the lower left side of his chest. While at the hospital, medical professionals located a loaded handgun in Kimble's pants pocket.

Investigators on the scene at Coolavin Apartments found four shell casings, all from a .380 gun. They also obtained surveillance video, in which they viewed a man, later identified as David Williams, run from the scene of the shooting and through the complex toward a hole in the fence that was often used by people entering or exiting the complex. The video also showed a woman, later determined to be Tyreshe Webb, Williams's girlfriend, leave the complex driving a blue Chevrolet Cobalt a short time after the shooting.[1]

Police also obtained video from the home security system of one of the houses in Williams's flight path which showed Williams get into the passenger side of the blue Cobalt. Police also located a .380 handgun along Williams's flight path. A Kentucky State Police lab technician determined that the .380 casings found at the scene had been shot from the .380 handgun found by police.

Several hours after the shooting, police detectives located the blue Cobalt just a couple of blocks from the Coolavin Apartments. Williams was in the passenger seat but quickly moved to the driver's seat when he saw police approaching. When the detectives apprehended Williams, he had a small bag of marijuana in his lap and 14.4 grams of a heroin-fentanyl mix in his pocket. He

---

[1] Webb was also indicted and was tried with Williams. Only Williams's appeal is pending before us, and therefore, we only discuss Webb as necessary for this Opinion.

2

also had approximately $2,123 in cash in his pocket. While executing a search warrant on the car, police located an additional 121.6 grams of a heroin-fentanyl mix in a plastic bag in the back passenger seat.

After his arrest, Williams was taken to police headquarters and was interviewed. He denied any involvement in the shooting and told police he was "just chillin'" that day. He provided few other details about where he was and what he did that day.

Williams was eventually indicted and tried on the charges of murder, aggravated trafficking in a controlled substance, and tampering with physical evidence. At trial, he testified in his own defense and told the jury that he was afraid for his life because Kimble had pointed a gun at him and threatened to kill him. Williams argued that his killing Kimble was justified, as he was acting in self-defense. Despite this, the jury found Williams guilty of murder, trafficking in a controlled substance (a lesser-included offense of aggravated trafficking in a controlled substance), and tampering with physical evidence. The jury recommended a total sentence of thirty-five (35) years in prison, and the trial court sentenced Williams consistently with this recommendation. This appeal followed.

## II. ANALYSIS

Williams alleges multiple errors by the trial court and urges this Court to reverse his convictions. First, he argues that the trial court erred in admitting into evidence a video of his interrogation by police, asserting that it violated his right to remain silent. Second, he argues that the trial court erred in admitting

3

the interrogation video because it contained evidence of other bad acts in violation of Kentucky Rule of Evidence (KRE) 404(b). Next, Williams argues that his final judgment is inconsistent with the jury's verdict and should be corrected. Williams also argues that the trial court erred in admitting surveillance videos from the Coolavin Apartments because they were not properly authenticated. He further asserts that the surveillance videos were improperly narrated by a Lexington Police detective, including an improper identification of him. Next, Williams argues that the trial court erred by failing to question a witness about her potential incompetency to testify. Williams also argues that the trial court erred in denying his motion for a directed verdict on the murder charge. He further argues that the trial court impermissibly limited his cross-examination of the lead detective. Finally, Williams argues that the Commonwealth improperly acted as its own witness during the sentencing phase of the trial. We address each of Williams's arguments in turn.

## A. Right to Remain Silent

Williams first argues that the trial court erred in admitting the video of his police interrogation and then in allowing the Commonwealth to impeach him with the evidence from that video, as these both violated his rights to due process, to a fair trial, and to remain silent. We review the trial court's decision to admit evidence for abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v.*

4

*Thompson,* 11 S.W.3d 575, 581 (Ky. 2000). Williams did not preserve this allegation of error, and he requests palpable error review pursuant to Kentucky Rule of Civil Procedure (RCr) 10.26.

During the testimony of Detective Travis Holt, the Commonwealth played a video of Williams's interrogation at police headquarters. During the interrogation, Detective Holt read Williams his *Miranda*[2] rights, and Williams waived those rights. Detective Holt then asked Williams how his day was and what he did that day. Williams said that his day was "fine" and wanted to know why he was being detained and questioned. Detective Holt explained that he was investigating a shooting and that Williams's name had "been brought up." Detective Holt repeatedly asked Williams to describe what he had done that day, and Williams repeatedly gave very vague answers. For instance, Williams said that he had "been all over the city today" and had "just been chillin'." He also said that the day had been just like every day, where he wakes up, lives, and then goes to sleep.

At one point during the interview, Williams said that he was "done" with the interview and that he had nothing to say. However, after making this statement, he continued to engage with Detective Holt, asking Detective Holt why he was asking about Williams's day and what he was investigating. After this comment by Williams and Detective Holt's repeated unsuccessful attempts to get Williams to describe his day, Detective Holt said, "I'm just asking you

---

[2] *Miranda v. Arizona,* 384 U.S. 436 (1966).

very basic questions of how was your day, where have you been? And most reasonable people would be able to answer that question." Williams responded by saying that he smoked, rode around, and was "chillin'." Detective Holt then asked Williams if Williams "mind[ed] to keep talking to" Detective Holt. Williams responded by saying that he didn't know how he could "help you with whatever you got going on." Shortly thereafter, Williams said that he "wish[ed]" he could help Detective Holt. He then made the comment described above that the day was like every other day where he wakes up, lives, and goes to sleep. Then Williams said that he wanted to end the interview. However, police continued to engage with Williams and question him for a short amount of time. Williams continued to give vague answers about his day, saying that his day was "simple." Eventually, the interview ended.

Later in the trial, Williams testified in his own defense. The Commonwealth began its cross-examination of Williams by confronting him with the lies the Commonwealth alleged he told police during the interview about his name. The following exchange then occurred.

> Commonwealth (CW): You also told the police that you wished that you could help them in their case in your interview, correct?

> Williams (DW): Yeah.

> CW: That was a lie, too?

> DW: No, it wasn't a lie.

> CW: You wished you could have helped them?

> DW: Yeah.

> CW: Why didn't you tell them then?

DW: Because I was nervous. I was nervous. When you in that situation, there's not textbook to go by. Ain't no protocols to go by. You just in the situation.

CW: When was the next time that you tried to tell the police what happened?

DW: I mean, I wanted to talk to my lawyer. I figured I would have another opportunity to talk to them with my lawyer. That never came until now.

CW: And you sat here for the entire trial, correct?

DW: Yes.

CW: And you've watched all of the witnesses and seen all of the evidence, correct?

DW: Yes.

In asking these last questions, the Commonwealth clearly sought to imply that Williams had concocted a story that was consistent with the evidence that had been presented to the jury. Williams argues to this Court that "[t]he police's suggestion that [Williams] was unreasonable for wanting to end the interview coupled with the Commonwealth's use of that interview to undermine [Williams]'s credibility was an error."

The law is clear that the Commonwealth cannot use a defendant's post-arrest, post-*Miranda* silence against him. *Hunt v. Commonwealth*, 304 S.W.3d 15, 35–36 (Ky. 2009) (citing *Doyle v. Ohio*, 426 U.S. 610 (1976); *Romans v. Commonwealth*, 547 S.W.2d 128, 130 (Ky. 1977)). However, this rule

> does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the

subject matter of his statements, the defendant has not remained silent at all.

*Anderson v. Charles*, 447 U.S. 404, 408 (1980).

In this case, the police did not "suggest[] that [Williams] was unreasonable for wanting to end the interview," as Williams asserts. Instead, Detective Holt was, at worst, saying that it was unreasonable for Williams to give vague answers to "simple questions" such as what he did that day. This statement was not a comment on Williams's attempts to end the interview but was a comment on the vagueness of the answers Williams was giving.

As for the Commonwealth's use of Williams's interview to "undermine [Williams]'s credibility," the trial court did not err in allowing this questioning. "The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 409. As we explained in *Taylor v. Commonwealth,*

> because [Williams] voluntarily provided a statement to the police and did not remain silent after receiving his *Miranda* rights, it was permissible for the prosecutor to cross-examine [Williams] about the discrepancies between his prior [statement] and his trial testimony. This includes asking [Williams] why, if his prior statement to the police was false and his current trial testimony is true, he did not reveal it to anyone prior to trial.

276 S.W.3d 800, 809 (Ky. 2008). Accordingly, the admission of Williams's interrogation video and the Commonwealth's cross-examination of Williams based on that video did not violate his right to remain silent.

**B. KRE 404(b)**

Williams next argues that the trial court erred in admitting the video of his police interrogation because it violated KRE 404(b). Specifically, he argues

that evidence that he gave the police a false name during his interrogation and that he admitted to purchasing prescription drugs on the street was evidence of other bad acts that were offered only to show that he acted in conformity with his criminal disposition. We review the trial court's decision to admit evidence for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581. Williams did not preserve this allegation of error, and he requests palpable error review pursuant to RCr 10.26.

KRE 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." It may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). It may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). KRE 404(b) is exclusionary in nature. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994).

To determine if other bad acts evidence is admissible, the trial court should use a three-prong test: (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect? *Purcell v. Commonwealth*, 149 S.W.3d 382, 399–400 (Ky.

9

2004). "The first prong of the test is whether the proffered evidence is relevant for a purpose other than criminal disposition." *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019). KRE 404(b)(1) identifies some acceptable uses of other bad act evidence, namely to provide "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This list, however, is not exhaustive but illustrative. *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky. 1998). Finally, the "other bad acts" evidence must be offered to prove material facts that are actually in dispute. *Leach*, 571 S.W.3d at 554.

"After determining relevancy, the trial court must determine if the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its introduction into evidence." *Id.* This standard is met if the trial judge believes "the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts." *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997).

Lastly, "the trial court must weigh the prejudicial nature of the 'other bad acts' evidence versus its probative value. Only if the potential for undue prejudice substantially outweighs the probative value of the evidence must it be excluded." *Leach*, 571 S.W.3d at 554.

Williams first argues that the trial court abused its discretion in admitting evidence that he gave the police a false name during his interrogation. To resolve this issue, we must first determine if this evidence was relevant for a purpose other than showing Williams's criminal disposition. We have previously held that "[e]vidence of assumption of a false name following

10

the commission of a crime is relevant as an admission 'by conduct, constituting circumstantial evidence of consciousness of guilt and hence of the fact of guilt itself.'" *Woodard v. Commonwealth,* 147 S.W.3d 63, 67 (Ky. 2004) (quoting *United States v. Guerrero,* 756 F.2d 1342, 1347 (9th Cir. 1984) (quoting *McCormick on Evidence* § 271, at 655 (2d ed. 1972))). Williams gave the false name to the police after the shooting, while being interrogated. "A reasonable jury could believe from this evidence that Appellant misrepresented himself with a consciousness of his guilt to avoid prosecution." *Id.* Thus, the evidence was relevant for a purpose other than to show Williams's criminal disposition and to prove a fact (consciousness of guilt) that was actually in dispute.

Next, it is clear that "the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its introduction into evidence." *Leach,* 571 S.W.3d at 554. Williams is on video tape providing the false name to the police officers. Finally, this evidence was not unduly prejudicial, and its potential to be so did not substantially outweigh its probative value. Evidence is only unduly prejudicial if it "produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose." *Id.* (citation omitted). No such prejudice resulted from the admission of evidence that Williams gave the police a false name during his interrogation.

Williams also argues that the trial court erred in admitting evidence that he admitted to buying prescription drugs on the street. In its brief to this Court, the Commonwealth does not offer any legitimate reason for introduction

11

of this evidence other than to argue that it was not "admitted to show a prior bad act by Williams [but instead was] simply part of the interrogation that was a part of the investigation." While this evidence may not have been admitted for the purpose of showing a bad act by Williams, it did in fact do so, and thus, was required to be admissible under KRE 404(b). The Commonwealth also does not assert that the evidence was "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). Without any argument by the Commonwealth for why this evidence was admissible under KRE 404(b), we will not concoct one on our own.

Any error in admission of this evidence must rise to the level of palpable error and affect Williams's substantial rights to merit reversal of his convictions. RCr 10.26. "For an error to rise to the level of palpable, it must be easily perceptible, plain, obvious and readily noticeable. Generally, a palpable error affects the substantial rights of the party only if it is more likely than ordinary error to have affected the judgment." *Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013) (internal citations and quotation marks omitted). Even then, relief is appropriate only "upon a determination that manifest injustice resulted from the error." RCr 10.26.

We cannot hold that the admission of evidence that Williams admitted to buying prescription drugs on the street affected Williams's substantial rights or resulted in manifest injustice. This evidence was admitted only through Williams's interrogation video. It was not discussed by any other witness and

12

was not mentioned again by the Commonwealth. Further, this evidence would have had very little impact on the ultimate issue in this case—whether Williams acted in self-defense when he shot Kimble. Accordingly, we hold that any error in the admission of this evidence was not palpable error meriting reversal of Williams's convictions under RCr 10.26.

## C. Trafficking in a Controlled Substance

Williams next argues that the trial court's final judgment should be corrected to be consistent with the jury's determination. Although Williams was indicted and tried on the charge of aggravated trafficking in a controlled substance, the jury found him guilty of the lesser-included offense of trafficking in a controlled substance. Despite his acquittal by the jury of the aggravated offense, the trial court's final judgment indicated he had been convicted of aggravated trafficking in a controlled substance. Williams acknowledges this allegation of error was not preserved but asserts that it is a clerical error, and thus we can correct it under RCr 10.10. The Commonwealth agrees that the final judgment is erroneous regarding this conviction and that this Court can and should correct it.

Under RCr 10.10, "[c]lerical mistakes in judgments . . . may be corrected . . . while the appeal is pending . . . with leave of the appellate court." "A clerical error is an error in the entry or recording of a judgment. These errors, mistakes, or omissions are not the result of the exercise of the judicial function." *Fagan v. Commonwealth*, 374 S.W.3d 274, 279 (Ky. 2012) (internal quotation marks and footnotes omitted). The error at issue in the final

13

judgment in this case is a clerical error, as it was not the result of judicial discretion or decision-making. *Id.* Instead, it was merely an error in the entry or recording of the judgment. *Id.* Accordingly, we vacate Williams's conviction of aggravated trafficking in a controlled substance and remand to the trial court for entry of a judgment consistent with the jury's finding of guilt on the lesser-included offense of trafficking in a controlled substance.

### D. Authentication of Surveillance Video

Williams next argues that the surveillance video from the Coolavin apartment complex lacked proper authentication when introduced into evidence by the Commonwealth. Additionally, he argues that the videos were manipulated prior to being shown to the jury. "On appellate review, the trial court's finding of authentication is reviewed for abuse of discretion." *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004) "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581. Williams did not object to the admission of the video, so this issue is not preserved. He requests palpable error review pursuant to RCr 10.26.

Lexington Police Department Detective Steven Cobb testified that he responded to the Coolavin apartment complex after the shooting to assist Detective Holt, the lead detective. Detective Cobb was tasked with looking at and collecting the surveillance video from the apartment complex. He testified that he was given this task "based on his comfort level with using surveillance

14

systems and DVRs and manipulating [them] to look at the video to be able to find out if we saw things." He further explained that the video files came from the DVR in the apartment complex office and that he collected them from the manager of the apartment complex. Detective Cobb also testified that the manager gave him access to pull additional files if needed during the investigation. The manager from the apartment complex who provided those files to Detective Cobb did not testify at the trial.

To begin, we do not believe that Detective Cobb's testimony regarding "manipulating" the videos implied in any way that he changed or altered the videos prior to their being shown to the jury. Instead, we believe that his testimony in this regard instead indicated that he was comfortable using the video player software to control his viewing of the video files. As such, we must merely determine if the videos were otherwise properly authenticated.

KRE 901(a) requires that certain types of evidence, such as a video, be authenticated or identified prior to its admission. This requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). Although not the only way to authenticate an item, one way this can be accomplished is through the "[t]estimony of [a] witness with knowledge." KRE 901(b)(1). That witness need only testify that the "matter is what it is claimed to be." *Id.* "The burden on the proponent of authentication is slight; only a prima facie showing of authenticity is required." *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky. 2010) (citation omitted).

15

In this case, Detective Cobb testified that the video files came from the DVR in the apartment complex office and that he received them from the manager of the complex. There is no indication in the record that these video files were not a fair and accurate depiction of the apartment complex on the date in question. Because the bar is so low for authentication, we cannot hold that the trial court erred in finding the videos were properly authenticated.

### E. Narration of Surveillance Video

Williams next argues that the trial court erred in allowing both Detective Cobb and the Commonwealth to improperly narrate the surveillance videos, which included an inappropriate identification of Williams by Detective Cobb. We review the trial court's decision to admit evidence for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581. Williams did not preserve this issue, and he requests palpable error review pursuant to RCr 10.26.

During Detective Cobb's testimony, the Commonwealth played several video files from the apartment complex surveillance system. On multiple occasions, the Commonwealth asked Detective Cobb what was important in the particular video being played. This resulted in Detective Cobb describing what he believed was happening in the video. For instance, regarding the first video played, Detective Cobb testified, "At approximately the 44-second mark, you will see the victim start to walk from the top of the parking lot . . . . The man in

16

the orange or red shirt is the victim." Shortly thereafter, he stated, "Approximately 15 seconds later, out of the same breezeway, I believe the suspect runs back out . . . . So, it shows the victim going into the breezeway and then a short time later the suspect leaving." This type of testimony continued throughout the playing of each surveillance video. Williams argues that this is an improper narration and interpretation of the video.

Further, during the playing of the third surveillance video, the Commonwealth asked Detective Cobb, "Alright, so at this point, having viewed this video, do you have an idea of who you're looking for regarding this crime? I mean, not personally, but who's your suspect?" Detective Cobb responded, "Well, I knew at that time that the person we were looking for was David Williams. But that was my first being able to see him at that point. That was the first idea I had about what he looked like or anything about him." Williams argues that this was an improper identification of him.

In *Morgan v. Commonwealth,* 421 S.W.3d 388 (Ky. 2014), this court held that KRE 602 and 701 govern the admissibility of narrative testimony. Under KRE 701, opinion testimony by a lay witness must be "[r]ationally based on the perception of the witness; [and] . . . [h]elpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue." Under KRE 602, a witness must have "personal knowledge before being allowed to testify about a subject." *Morgan,* 421 S.W.3d at 392. In *Morgan,* we explained,

> [A] lay witness "may not interpret audio or video evidence, as such
> testimony invades the province of the jury, whose job is to make
> determinations of fact based upon the evidence." "It is for the jury

17

> to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness."

*Id.* (internal citations omitted). Thus, "narration of a video may be proper but only if it is comprised of opinions and inferences that are rationally based on the witnesses' own perceptions of which he had personal knowledge and that are helpful to the jury." *Boyd v. Commonwealth*, 439 S.W.3d 126, 131 (Ky. 2014). Conversely, narration of events that the witness did not perceive in real time is violative of KRE 602 and 701 and inadmissible. Id. at 131–32. Finally, regarding identifications through video evidence, a witness is permitted to identify a person in a video, "when the witness is in a position to make an identification based on personal knowledge that is not available to the jury." *Id.* at 132 (citations omitted).

In this case, Detective Cobb did not view in real time the events captured by the surveillance videos, and therefore, he did not have personal knowledge of those events. Thus, his testimony regarding the contents of the videos was inadmissible, and the trial court abused its discretion in admitting it. Further, Detective Cobb testified that he did not know what Williams looked like, thus he did not have any personal knowledge from which to identify Williams on the surveillance video. Therefore, the admission of his testimony identifying Williams was also an abuse of discretion.

However, because Williams did not preserve these allegations of error, we will only reverse his convictions if the errors rise to the level of palpable error and affect his substantial rights. RCr 10.26. "For an error to rise to the level of palpable, it must be easily perceptible, plain, obvious and readily noticeable.

18

Generally, a palpable error affects the substantial rights of the party only if it is more likely than ordinary error to have affected the judgment." *Martin*, 409 S.W.3d at 344 (internal citations and quotation marks omitted). Even then, relief is appropriate only "upon a determination that manifest injustice resulted from the error." RCr 10.26.

In this case, the errors regarding the improper narration of the surveillance video and the improper identification of Williams did not affect Williams's substantial rights and did not result in manifest injustice. Williams admitted to shooting Kimble but asserted that he did so in self-defense. Because of this, his identification was never in dispute. Further, his movements after the shooting were not contested facts before the jury. Finally, "because the jurors were watching the video and were in a position to interpret the security footage independently from the testimony," we are convinced the error did not affect Williams's substantial rights and did not result in manifest injustice. *Boyd*, 439 S.W.3d at 132.

### F. Angelicole Macomber's Competency

Williams next argues that the trial court erred by failing to adequately question Angelicole Macomber regarding her competency to testify. He asserts that Macomber may have been under the influence of narcotics, based on her history of drug use, her rapid and mumbled responses to questions, and her fidgety and unsettled mannerisms. This issue was preserved by Williams's objection and request that the trial court inquire into whether she was under the influence.

19

Because the trial court "is in the unique position to observe witnesses and to determine their competency," we review the trial court's competency determination for an abuse of discretion. *Bart v. Commonwealth*, 951 S.W.2d 576, 579 (Ky. 1997) (citing *Kotas v. Commonwealth,* 565 S.W.2d 445, 447 (Ky. 1978)); *B.B. v. Commonwealth*, 226 S.W.3d 47, 50 (Ky. 2007) (citation omitted). Under KRE 601(a), "[e]very person is competent to be a witness except as otherwise provided in these rules or by statute." However,

> [a] person is disqualified to testify as a witness if the trial court determines that he:
>
> (1) Lacked the capacity to perceive accurately the matters about which he proposes to testify;
>
> (2) Lacks the capacity to recollect facts;
>
> (3) Lacks the capacity to express himself so as to be understood, either directly or through an interpreter; or
>
> (4) Lacks the capacity to understand the obligation of a witness to tell the truth.

KRE 601(b). In short, "a witness is competent to testify if she is able to perceive accurately that about which she is to testify, can recall the facts, can express herself intelligibly, and can understand the need to tell the truth." *Pendleton v. Commonwealth*, 83 S.W.3d 522, 525 (Ky. 2002).

"[T]he determination of competency is an ongoing one for the judge to make based on the witness'[s] actual testimony at trial." *Kentucky v. Stincer*, 482 U.S. 730, 740 (1987). In making this determination, "the power to disqualify witnesses 'should be applied grudgingly, only against the "incapable" witness.'" *Ross v. Commonwealth*, 531 S.W.3d 471, 477 (Ky. 2017) (quoting

20

Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 3.00[2][b] at 239 (5th ed. 2013)). Further, "[t]he competency bar is low. . .." *Pendleton*, 83 S.W.3d at 525 (citing *Jarvis v. Commonwealth,* 960 S.W.2d 466 (Ky. 1998)). On appeal, we "consider a trial court's competency determination from a review of the entire record, including the evidence subsequently introduced at trial." *B.B.,* 226 S.W.3d at 49 (citation omitted).

In this case, although Macomber was often difficult to hear during her testimony, she did not show any signs of being intoxicated so that she was incompetent to testify. Her testimony was coherent and understandable. She responded appropriately to the questions asked of her, and much of her testimony was corroborated by other witnesses. Because of this, we cannot hold that the trial court abused its discretion in failing to inquire further into Macomber's alleged incompetency to testify.

**G. Directed Verdict**

Next, Williams argues that the trial court erred in denying his motion for a directed verdict on the charge of murder. This issue was preserved by Williams's motions for a directed verdict at the close of the Commonwealth's case and at the close of all evidence.

Our directed verdict standard has been firmly established in *Commonwealth v. Benham*:

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of

> ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

816 S.W.2d 186, 187 (Ky. 1991). In assuming that the evidence for the Commonwealth is true, the Court does so "regardless of whether the evidence, usually testimony, has been attacked or impeached." *Southworth v. Commonwealth*, 435 S.W.3d 32, 42 (Ky. 2014). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020).

Williams argues that the Commonwealth presented insufficient evidence that he was not acting in self-defense but instead intentionally killed Kimble. Williams further asserts that the Commonwealth did not present any evidence of a prior connection between them that would lead him to have any motive to kill Kimble. He further argues that the Commonwealth did not present any witness testimony or video evidence to contradict his version of events.

Under Kentucky Revised Statutes (KRS) 507.020(1) and 503.050, a person is guilty of murder if (1) he or she causes the death of another person, (2) "with intent to cause the death of another person" or while "wantonly engag[ing] in conduct which creates a grave risk of death to another person,"

22

and (3) while not privileged to act in self-protection. Regarding self-protection, under KRS 503.050,

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.

> (2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.

This Court has previously explained, "[r]arely is a defendant relying upon self-defense entitled to a directed verdict. Only in the unusual case in which the evidence conclusively establishes justification and all of the elements of self-defense are present is it proper to direct a verdict of not guilty." *West v. Commonwealth*, 780 S.W.2d 600, 601 (Ky. 1989). In this case, we cannot say that the evidence "conclusively establishe[d]" that Williams acted in self-defense.

In this case, the only evidence to support Williams's self-defense claim was his own testimony. This Court has previously

> held that a defendant's statement that he acted in self-defense or his description of events which show such to be the case need not be accepted at face value where the jury may infer from his incredibility or the improbability of the circumstances that one or more of the elements necessary to qualify for self-defense is missing.

*Id.* (citing *Taul v. Commonwealth*, 249 S.W.2d 45 (Ky. 1952)). We have also "held that if the evidence relied upon to establish self-defense is contradicted or if there is other evidence from which the jury could reasonably conclude that

23

some element of self-defense is absent, a directed verdict should not be given."
*Id.* (citing *Townsend v. Commonwealth*, 474 S.W.2d 352 (Ky. 1971)).

Although Williams testified that Kimble pointed a gun at him and threatened to kill him, there was no corroborating evidence of this. Williams did not tell this version of events to the police or anyone else until after evidence had been presented at trial that Kimble was in possession of a gun at the time of his death. Further, the gun was found in Kimble's pocket, and not on the ground next to or near him as would be expected if he was holding the gun when he was shot. Based on all of the evidence presented at trial, "the jury could reasonably conclude that some element of self-defense [was] absent." *Id.* Thus, the trial court did not err in denying Williams's motion for a directed verdict on the charge of murder.

### H. Limit on Cross-Examination

Williams next argues that the trial court erred in limiting his cross-examination of Lexington Police Detective Travis Holt. He asserts that his rights to confront witnesses against him and to obtain witnesses in his favor under both the United States and Kentucky constitutions were violated by the trial court's limitation.

During cross-examination by Williams, Detective Holt testified that during the investigation, police spoke to a witness who told the police that they had heard an argument prior to hearing gunshots. Detective Holt further testified that the witness did not say who was arguing. Williams then asked Detective Holt if the witness had said whether the argument was a verbal

24

argument. The Commonwealth objected, arguing that the evidence sought to be elicited by Williams was prohibited hearsay.[3] The trial court agreed and sustained the Commonwealth's objection.

We review the trial court's evidentiary rulings for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581. Although it is very difficult to hear Williams's arguments at the bench conference on this issue, the Commonwealth does not contest Williams's preservation of this issue.

Under KRE 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, "[a]ll relevant evidence is admissible" unless prohibited by constitution, statute, or rule. KRE 402. However, "[h]earsay is not admissible" except as otherwise provided. KRE 802. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c).

Williams asserts that the information he sought to elicit from Detective Holt "had a legitimate non-hearsay purpose—corroborating [Williams]'s claim that he acted in self-defense." He cites to *Moseley v. Commonwealth*, 960

---

[3] It is very difficult to hear Williams's response to the Commonwealth's objection on the trial video contained in the record.

25

S.W.2d 460 (Ky. 1997), to support his argument. In *Moseley*, however, this Court explained that "[a] legitimate nonhearsay use of an out-of-court statement always involves relevancy in the *mere utterance of the words* comprising the statement (i.e., a logical connection between the utterance of the words and some material element of the case)." *Id.* at 461–62. In this case, Williams did not establish any relevancy in the fact that the unnamed witness merely uttered the words that he or she heard an argument (verbal or not) before hearing gunshots. Instead, this evidence was elicited only to prove the truth of what the witness stated—that there was an argument prior to the gunshots. Accordingly, the trial court did not abuse its discretion in excluding this evidence.

## I. Sentencing Phase

Williams's final argument is that the Commonwealth impermissibly acted as its own witness during the sentencing phase of trial by reading from the certified copies of Williams's prior convictions rather than calling a competent witness to introduce this evidence. Williams acknowledges this issue was not preserved, and he requests palpable error review pursuant to RCr 10.26.

During the Commonwealth's opening statement of the penalty phase of trial, the Commonwealth's Attorney explained that he would not be calling any witnesses to testify but that he would present Williams's prior convictions and would produce a copy of the parole eligibility guidelines. He further explained that the judgments of conviction would not go back to the jury room but that

26

he would instead read the judgments to the jury. After the Commonwealth's opening statement, Williams waived his opening statement.

The Commonwealth's Attorney then stood at the podium in the courtroom and began to directly address the jury, just as he had during his opening statement. Without calling any witnesses, he explained to the jury that Williams would be parole eligible after serving 85% of his sentence on the charge of murder, 50% of his sentence on the charge of trafficking, and 15% of his sentence on the charge of tampering with physical evidence. The trial court then admonished the jury that an inmate is not guaranteed parole merely because he is eligible for it. The Commonwealth's Attorney then proceeded to read from the judgment of each of Williams's prior convictions. He read the indictment number, date of offense, charge, date of judgment, and sentence for each prior conviction. The Commonwealth then rested its penalty phase case.

We have directly addressed "the proper manner in which evidence of prior convictions may be introduced to the jury" in *Webb v. Commonwealth.* 387 S.W.3d 319, 330 (Ky. 2012). We explained that "the first and preferred method of introducing this evidence is for the judge to recite the elements of the prior crimes to the jury." *Id.* However,

> if both parties agree, the Commonwealth, may read the elements of the crime(s) to the jury. In doing so the role confusion should be explained to the jury so it understands that that the prosecutor is not a witness, but rather an attorney who is reading agreed-upon, stipulated evidence. If, however, the parties do not agree, the Commonwealth is left with two options: (1) the judge may read the elements of the crime(s), or (2) the Commonwealth may call a witness to testify as to the elements of the crime(s) committed as reflected in prior judgments.

27

*Id.* at 330–31. It is clear that our authorized procedures for introducing evidence of Williams's prior convictions were not followed in this case.

In *Webb*, we further explained that there is "no constitutional due process violation, without more, with the mere reading by the prosecutor to the jury of the elements of the prior offenses." *Id.* at 330. Williams urges us to overrule this portion of *Webb*. We decline to do so. We do note, however, that despite Williams's failure to argue it, there was "more" in this case, as the Commonwealth's Attorney also, in effect, testified about Williams's parole eligibility.

For the reasons stated above, we hold that the trial court erred in permitting the Commonwealth to present its sentencing case in the way that it did. As we explained in *Webb*, "the roles of advocate and witness become blurred" when the Commonwealth presents evidence to the jury by reading from documents or explaining what they mean. *Id.* This is especially problematic because the Commonwealth's Attorney carries with him the prestige of that office, and the jury is required to judge the credibility of the person holding that position. We have explained that the credibility of the Commonwealth's Attorney "is always more or less strengthened by his official position, outside of the record or evidence, which may tend in the least degree to prejudice the rights of the accused." *Holt v. Commonwealth*, 219 S.W.3d 731, 734 (Ky. 2007) (quoting *Commonwealth v. Cook*, 7 S.W. 155, 156 (1888)).

Proceeding in this way is further problematic because it implicates Williams's constitutional rights to confront and cross-examine the witnesses

28

against him. Because there was no witness, there was no way for Williams to challenge the evidence put forth by the Commonwealth. Because of this, without an explicit waiver or agreement on the record, as described in *Webb*, the reading of prior convictions by the Commonwealth's Attorney is strictly prohibited.

Having determined that the trial court erred in permitting the Commonwealth to present its case as it did in the sentencing phase of the trial, we must determine whether this error was reversible. Any error in the admission of this evidence must rise to the level of palpable error and affect Williams's substantial rights to merit reversal of his convictions. RCr 10.26. "For an error to rise to the level of palpable, it must be easily perceptible, plain, obvious and readily noticeable. Generally, a palpable error affects the substantial rights of the party only if it is more likely than ordinary error to have affected the judgment." *Martin*, 409 S.W.3d at 344 (internal citations and quotation marks omitted). Even then, relief is appropriate only "upon a determination that manifest injustice resulted from the error." RCr 10.26.

In this case, Williams faced a penalty of up to life in prison. Specifically, the murder charge carried a penalty range of twenty to fifty years or life in prison. KRS 507.020(2); KRS 532.030(1). The jury recommended a sentence of twenty-five years on this charge. The trafficking in a controlled substance charge carried a penalty range of five to ten years in prison. KRS 218A.1412(3)(a); KRS 532.060(2)(c). The jury recommended a sentence of ten years in prison. The tampering with physical evidence charge carried a penalty

range of one to five years in prison, and the jury recommended a sentence of one year. KRS 524.100(2); KRS 532.060(2)(d). The jury further recommended that the sentences for trafficking and tampering run concurrently to each other and consecutively to the sentence for murder. In total, the jury recommended a sentence of thirty-five years. Objectively, this is a relatively low sentence, given the seriousness of the charges and the potential sentence of life imprisonment. Further, because the jury's recommended sentence is just that, a recommendation, the trial court could have deviated from it, including by changing the recommended concurrent/consecutive combination. KRS 532.070(1); *Sutton v. Commonwealth*, 627 S.W.3d 836, 856 (Ky. 2021) (citations omitted). At final sentencing, the trial court had access to all of the information presented to the jury in an erroneous manner and took it all into consideration in deciding on Williams's final sentence. KRS 532.050. Because of this, we cannot hold that manifest injustice resulted from the errors during the sentencing phase of Williams's trial.

## III. CONCLUSION

For the foregoing reasons, we affirm Williams's convictions of murder and tampering with physical evidence, vacate his conviction of aggravated trafficking in a controlled substance, and remand to the Fayette Circuit Court for proceedings consistent with this Opinion.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Nickell and Thompson, JJ., concur. Lambert, J., concurs in result only without opinion.

30

COUNSEL FOR APPELLANT:

Kayla Danielle Deatherage
Kayley Valentien Barnes
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General