# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: AUGUST 22, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2023-SC-0125-MR

FESS POLLY                                          APPELLANT


V.                ON APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
NO. 21-CR-00034


COMMONWEALTH OF KENTUCKY                APPELLEE


AND


## 2023-SC-0135-MR

DERRICK POLLY                                    APPELLANT


V.                ON APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
NO. 21-CR-00033


COMMONWEALTH OF KENTUCKY                APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Fess Polly and Derrick Polly[1] are brothers and were jointly tried and convicted by a Harlan County jury of murder by complicity. Each received a

---

[1] For clarity, we will refer to Fess and Derrick by their first names.

total sentence of twenty years' imprisonment and separately appeal to this Court as a matter of right.[2] Because the underlying facts and legal issues overlap, we have elected to address these appeals together in a single opinion. Discerning no reversible error in either appeal, we affirm the judgment of the Harlan Circuit Court.

## FACTS AND PROCEDURAL HISTORY

Destiny Stamper shot and killed Wilmer Perez upon Fess's threat to her own life. Derrick was present at the scene and the extent of his involvement in the murder was disputed at trial. The circumstances surrounding the murder are obscure: Perez's body was never recovered, and the police did not discover any physical evidence.

Perez was last seen in Cumberland, Kentucky, on April 1, 2020. The next day, Perez's brothers reported him missing after he did not return home from work at a local restaurant. Sergeant Tyler Hensley[3] began to investigate and received information that he should speak with Christopher[4], a juvenile, who was dating the daughter of Crystal Eads. Eads is the sister of Amanda Whitehead who was in a relationship with Derrick at the time. Sgt. Hensley also learned Christopher was friends with Perez and that an incident occurred between them at Perez's house on March 31, 2020, the day before his disappearance.

---

[2] KY. CONST. § 110(2)(B).

[3] By the time of trial, Sgt. Hensley had been promoted to the rank of Chief.

[4] Because this individual is a minor, we refer to him by a pseudonym.

Sgt. Hensley went to look for Christopher at Eads's residence. Eads told him that Christopher was at her father's trailer. When he thereafter arrived at that location, Sgt. Hensley could not locate Christopher, but observed Derrick and Whitehead taking items from the trailer and placing them into a car. Believing this to be a family matter, Sgt. Hensley dismissed the possibility of any possible criminal activity. He then returned to Eads's residence where he located and spoke with Christopher.

During this conversation, Christopher downplayed his relationship with Perez as a mere acquaintanceship. Sgt. Hensley then informed Christopher that Perez was missing. When asked if he had seen Perez, the color left Christopher's face and his jaw began shaking uncontrollably. After a few seconds, Christopher regained his composure and said he did not know anything about Perez's disappearance.

Sgt. Hensley returned to Eads's residence later that night and discovered Derrick and Whitehead inside. Whitehead gave Sgt. Hensley permission to speak with her daughter the next day. At that meeting, Whitehead's daughter mentioned Stamper's name.

On April 7, 2020, Sgt. Hensley returned to Eads's residence where he spoke with Derrick, Whitehead, Whitehead's daughter, Christopher, and Eads at the same time. Whitehead showed Sgt. Hensley some messages from social media to establish their whereabouts on the night of Perez's disappearance. Sgt. Hensley noticed certain messages had been deleted and later obtained a warrant to conduct a thorough search of Derrick's social media accounts.

Subsequently, Sgt. Hensley went to the residence of Brittany Williams to locate Stamper. Williams told Sgt. Hensley that Stamper lived in an apartment downstairs. Stamper provided Sgt. Hensley with what he believed was helpful information before he left to continue his investigation. Some time later that evening while on traffic patrol, Sgt. Hensley observed Williams driving erratically as if she was trying to get his attention. Sgt. Hensley then followed Williams into a nearby parking lot.

Before Sgt. Hensley approached her vehicle, Williams immediately got out and fell to the ground crying in terror. She told Sgt. Hensley he had to "get" Stamper because "she killed that boy." Sgt. Hensley took Williams to a quiet place to talk. Based on the information provided, Sgt. Hensley went to the residence of Alex Jenkins and discovered a .22 caliber handgun, which Jenkins admitted having stolen from Stamper.

On April 9, 2020, Sgt. Hensley spoke with Stamper for the second time and pressed her for information. Stamper denied knowing anything about Perez and claimed she was in Lexington at the time of his disappearance. The next day, Sgt. Hensley conducted a formal interview with Stamper. Stamper maintained that she was not involved in Perez's disappearance. While Sgt. Hensley believed Stamper did a "good job" establishing her whereabouts up to March 31, her story began to "melt" in relation to the timeline thereafter. Sgt. Hensley concluded that Stamper was not being truthful in the interview.

After the interview, Angie Burke[5] contacted police to report that Stamper had shot and killed someone. Realizing that Stamper was comfortable speaking with Burke, Sgt. Hensley suggested that Burke record a conversation with Stamper. Burke would later act on this suggestion and obtain a recording of Stamper.

In the meantime, after learning Fess was in a relationship with Stamper, Sgt. Hensley returned to Eads's residence to speak with him. Fess voluntarily accompanied Sgt. Hensley to another location where he showed Sgt. Hensley some messages indicating he was not with Stamper on April 1 and 2. Sgt. Hensley stated these messages led him to believe Stamper was not present at the time of Perez's initial disappearance.

On April 12, 2020, Burke played Sgt. Hensley a recording of Stamper, which he characterized as a confession. Then, at a subsequent interview on April 15, 2020, Stamper confessed to shooting and killing Perez. She told Sgt. Hensley in late March 2020, she traveled to Lexington, Kentucky, with a friend to do some "running around." At some point, she went to stay with another individual. Stamper proceeded to steal that individual's car and drove back to Harlan County to visit Fess a couple of days later. Upon her return, Stamper went to Eads's residence where Fess and Derrick were staying.

Fess declined Stamper's offer to use drugs and told her that he needed her to give him a ride "to take care of something." Stamper drove Fess in the

---

[5] Burke is a close friend of Williams and was referred to as Stamper's aunt, but it is unclear if she is actually a family relation.

5

stolen car while Derrick and Whitehead traveled ahead of them in Derrick's truck. After a journey of only a few minutes, the four arrived at an old mining site called the Blue Gates that was frequently used as a gathering place. As Stamper exited the vehicle, she immediately noticed Perez on the ground. He was badly beaten and bloodied. She asked Fess what was going on to which he replied he would take care of it.

Fess began to kick Perez while Derrick swung a machete nearby. The two brothers derided and mocked Perez as Stamper protested to no avail. Whitehead stayed beside the vehicles. Fess sent Stamper back to the car to retrieve his gun. He had already taken Stamper's .22 handgun when they arrived at the Blue Gates. When Stamper returned with Fess's .40 caliber gun, he pointed the .22 at her and commanded her to shoot Perez. Stamper said she would not shoot him for no reason to which Fess replied that he would shoot her if she refused.

Stamper closed her eyes and fired two shots. She did not see whether Perez was struck but heard him groan which ended after a minute. Stamper then took Whitehead back to Eads's residence while Fess and Derrick remained at the Blue Gates. Some time later, Fess explained to Stamper that the boyfriends of Whitehead's daughters had robbed Perez and when Perez came to recover his property things "just got out of hand."

In May 2020, Stamper changed her story and told Sgt. Hensley that Perez had been stabbed to death in the bathroom of a trailer. Sgt. Hensley searched the trailer but did not find any evidence consistent with this scenario.

6

During his investigation, Sgt. Hensley did not discover any physical evidence connected with the death of Perez whose body was never recovered. However, the search of Derrick's social media account revealed he sent a message near the time of Perez's disappearance pertaining to two possible robberies. Additionally, Derrick sent a message on April 10, 2020, stating, "the polic3 [police] is investigating me over a murder. I may need u to let th3m [them] know we was with u [you] in that house."[6] Sgt. Hensley testified he was struck by the use of the word "murder" because, at that time, Derrick could have only known about a missing person investigation.

On March 17, 2021, Fess, Derrick, and Stamper were each indicted for murder. Additionally, Fess and Derrick were each charged with tampering with physical evidence and being first-degree persistent felony offenders (PFO). The murder charge against Stamper was dismissed after she reached an agreement with the Commonwealth to testify "consistently with her previous statements to the police, including that she did, in fact, shoot Wilmer Perez twice in the chest, and that she did so only because Fess Polly was holding a gun to her head."[7] Stamper's trial testimony was consistent with the version of events she provided Sgt. Hensley at the interview of April 15, 2020.

---

[6] The record does not reveal to whom this message was sent.

[7] We note duress does not constitute a defense to intentional homicide under Kentucky law. Kentucky Revised Statutes (KRS) 501.090(1). Similarly, because intentional homicide cannot be considered a lesser evil, the defense of choice of evils is not available as a justification for intentional murder. KRS 503.030(1).

7

Fess and Derrick were tried together. The Commonwealth called Sgt. Hensley and Stamper as witnesses. Additionally, James Randall Nantz, a convicted felon with eight pending felony charges, testified on behalf of the Commonwealth and corroborated Stamper's testimony. Nantz claimed Fess told him the details of the crime while they shared a jail cell over an eight-month period. Perez's brothers also testified they had not seen or heard from Perez since his disappearance and that Perez had felt threatened by Fess and Derrick.

Fess and Derrick called Derrick Moore, the Chief Deputy Jailer, who testified that Nantz was "hard to house" and had to be moved frequently because of conflicts with other inmates as he was a known informant among the jail population dating back to 2007. Moore also stated it was possible for inmates to read each other's court papers. Additionally, the defense called Kenneth Layne, a retired Sergeant with the Kentucky State Police, to testify regarding the assistance he provided to Sgt. Hensley in the investigation. To confirm the lack of physical evidence, Fess and Derrick also called Meghan Mae, a forensic scientist employed by the Kentucky State Police.

At the conclusion of the Commonwealth's case-in-chief, the trial court granted a directed verdict in favor of Fess and Derrick on the charge of tampering with physical evidence. Following trial, the jury found Fess and Derrick guilty of murder. The Commonwealth declined to present evidence on the PFO charges during the sentencing phase because a murder conviction is

not subject to enhancement.[8]  The jury recommended a total sentence of twenty years' imprisonment, which the trial court ultimately accepted.  These appeals followed.

## LAW AND ANALYSIS

### 1. Trial court properly denied a directed verdict on murder charges.

Fess and Derrick first argue the trial court erred by denying their motions for directed verdict on the charge of murder by complicity.  We disagree.

The denial of a motion for directed verdict will not be reversed unless the appellate court determines "it would be clearly unreasonable for a jury to find guilt."  *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).  When confronted with a motion for directed verdict, the trial court must assume the truth of the Commonwealth's evidence and "draw all fair and reasonable inferences from the evidence in favor of the Commonwealth."  *Id.*  A conviction must be based on "evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence."  *Id.* at 188.  Ultimately, the directed verdict standard depends on "the statutes creating the offense[,]" and "is not controlled by the law as described in the jury instructions[.]"  *Acosta v.*

---

[8] "Murder is a capital offense and a murder conviction is not subject to PFO enhancement."  *Berry v. Commonwealth*, 782 S.W.2d 625, 627 (Ky. 1990), overruled on other grounds by *Chestnut v. Commonwealth,* 250 S.W.3d 288 (Ky. 2008).

9

*Commonwealth*, 391 S.W.3d 809, 816 (Ky. 2013), overruled on other grounds

by *Ray v. Commonwealth*, 611 S.W.3d 250 (Ky. 2020).

KRS 507.020 defines murder in pertinent part as follows:

(1) A person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the
death of such person or of a third person; except that in any
prosecution a person shall not be guilty under this subsection if he
acted under the influence of extreme emotional disturbance for
which there was a reasonable explanation or excuse, the
reasonableness of which is to be determined from the viewpoint of
a person in the defendant's situation under the circumstances as
the defendant believed them to be. However, nothing contained in
this section shall constitute a defense to a prosecution for or
preclude a conviction of manslaughter in the first degree or any
other crime.

Additionally, "[a] finding of guilt by complicity requires: '(1) proof of commission

of an offense by another person and (2) proof of the defendant's participation in

commission of that offense.'" *Stieritz v. Commonwealth*, 671 S.W.3d 353, 360

(Ky. 2023) (quoting *Parks v. Commonwealth*, 192 S.W.3d 318, 327 (Ky. 2006)).

We have recognized two distinct theories of accomplice liability under KRS

502.020:

The primary distinction between these two statutory theories of
accomplice liability is that a person can be guilty of "complicity to
the act" under KRS 502.020(1) only if he/she possesses the *intent*
that the principal actor commit the criminal act. However, a
person can be guilty of "complicity to the result" under KRS
502.020(2) without the intent that the principal's act cause the
criminal result, but with a state of mind which equates with "the
kind of culpability with respect to the result that is sufficient for
the commission of the offense," whether intent, recklessness,
wantonness, or aggravated wantonness . . . . The most common
examples of offenses having a prohibited result are homicide, with
the death of another as the prohibited result.

*Tharp v. Commonwealth*, 40 S.W.3d 356, 360-61 (Ky. 2000). "Complicit conduct may be proven through either the existence of a basic conspiracy, or aid and counsel, or failing to make a proper effort to prevent the commission of an offense when the defendant has a legal duty to do so." *Stieritz*, 671 S.W.3d at 360.

Fess and Derrick both argue entitlement to a directed verdict based on the lack of any physical evidence connecting them to the crime, e.g., neither the body nor the murder weapon was recovered. Additionally, they argue the testimony of Stamper and Nantz was so obviously biased and improbable as to have been inherently unbelievable and altogether lacking in probative value.

In every criminal prosecution, the Commonwealth bears the burden of proving the corpus delicti, which is defined as "the body of the offense, the substance of the crime." *Warmke v. Commonwealth*, 297 Ky. 649, 180 S.W.2d 872, 873 (1944). Specific to the offense of homicide, "[p]roof of the corpus delicti . . . involves two principal facts, namely, that the person is dead and that he died as a result of the injury alleged to have been received." *Id.* In other words, "there must be proof of a death and proof that such death was caused by the criminal agency of the accused." *Id.*

Although we have consistently recognized "the typically onerous burden of proving the corpus delicti beyond a reasonable doubt," *Carpenter v. Commonwealth*, 681 S.W.3d 36, 43 (Ky. 2023), "the law does not subscribe to the rigid formula that the body must be found or seen after death." *Warmke*,

11

180 S.W.2d at 873. Indeed, a murder conviction may be supported entirely by circumstantial evidence. *Id.* For example, death may be proven

> by proof of criminal violence adequate to produce death and which accounts for the disappearance of the body. In short, the body must be found or there must be proof of death which the law deems to be equivalent to direct evidence that it was found.

*Id.* (internal quotation marks and citation omitted).

Here, Stamper's testimony placed Fess and Derrick at the scene of the crime. She admitted she shot Perez at the behest of Fess and stated she did not hear Perez make any sound after his groaning ceased. Fess and Derrick remained alone with the body. Perez has never been seen or heard from again. Stamper's version of events was largely corroborated by Nantz. Additionally, Perez's brother testified, without objection, that Perez had previously felt threatened by Fess and Derrick. Assuming the truth of this evidence and indulging all fair and reasonable inferences therefrom, we conclude the Commonwealth carried its burden of proving the corpus delicti, and thus, the trial court properly denied the motion for directed verdict.

As for the credibility of Stamper and Nantz, this was clearly a matter for the jury to decide. The general rule in Kentucky is that "[i]t is only where the testimony is so incredible *on its face* as to require its rejection as a matter of law that the jury will not be permitted to consider it." *Ross v. Commonwealth*, 531 S.W.3d 471, 475 (Ky. 2017) (quoting *Daulton v. Commonwealth*, 310 Ky. 141, 220 S.W.2d 109, 110 (1949)). This unusual circumstance arises "when the substance of the testimony, *detached from the personal credibility of the*

12

*witness . . .* is so laden with doubt and implausibility that it cannot rationally be regarded as a fact capable of supporting a verdict." *Id.* (emphasis added). In other words, "the jury may not . . . base its verdict upon a statement as to what occurred or how something happened when it is opposed to the laws of nature or is clearly in conflict with the scientific principles, or base its verdict upon testimony that is so incredible and improbable and contrary to common observation and experience as to be manifestly without probative value." *Id.* at 476 (quoting *Coney Island Co. v. Brown*, 290 Ky. 750, 162 S.W.2d 785, 787-88 (1942)). We acknowledge Fess and Derrick provide "plenty of reasons to disbelieve [Stamper and Nantz], but the substance of [their] testimony describing [Fess and Derrick's] role in the crime is not so extraordinarily implausible or inherently impossible that it is manifestly without probative value or patently unworthy of belief; it could have happened as [they] testified." *Id.* at 477.

Derrick further argues his murder conviction cannot stand because the Commonwealth failed to prove his specific conduct was more consistent with guilt than innocence. He is correct that "absent a showing of other facts and circumstances connecting a defendant with the crime, mere presence at the scene of the crime is not sufficient to attach guilt to defendant." *Rogers v. Commonwealth*, 315 S.W.3d 303, 310 (Ky. 2010) (citation omitted). However, "[c]onspiracy, as envisioned by the statute governing complicity" merely requires "that defendants agree to act in concert to achieve a particular

13

objective and that at least one of them commit that objective." *Id.* (citation omitted).

Viewing the evidence in the light most favorable to the Commonwealth, we cannot credit the assertion that Derrick was merely present at the scene or that his behavior was as consistent with innocence as with guilt. Nantz testified Derrick and Fess lured Perez to a remote area to rob him of drugs or money and that Derrick had "roughed him up pretty tough." Derrick subsequently left Eads's residence together with Fess, Stamper, and Whitehead. At the time they arrived at the Blue Gates, Stamper testified that Perez was already severely beaten to the point where he could not stand. While Fess kicked Perez on the ground, Derrick remained nearby swinging a machete. Derrick joined Fess in cursing and mocking Perez as he suffered. Derrick also stayed with Fess at the scene after the shooting. Additionally, he sent a Facebook message which referenced a murder investigation before he reasonably could have known such information, thereby suggesting consciousness of guilt.

While we agree with the trial court that the directed verdict issue is a closer call pertaining to Derrick, we also recognize the scope of complicity under KRS 502.020 is "broad enough to embrace acts, words, agreements, encouragement, incitement, and every form of participation in concerted criminal activity." *Young v. Commonwealth*, 426 S.W.3d 577, 582 (Ky. 2014) (quoting George G. Seelig, *Kentucky Criminal Law* § 3–3(b)(4) at 107 (2d. ed. 2008)). Further, the manner of complicity is "definitional, not substantive[,]"

14

meaning the various types of conduct listed in KRS 502.020 are "not to be viewed as a separate or alternative theory." *Finney v. Commonwealth*, 638 S.W.2d 709, 710 (Ky. App. 1982), overruled on other grounds by *Hibbard v. Commonwealth*, 661 S.W.2d 473 (Ky. 1983). In other words, "the acts giving rise to accomplice liability are not so readily defined and may encompass a continuum of events." *Mills v. Commonwealth*, 44 S.W.3d 366, 371 (Ky. 2001). On these facts, we cannot conclude it was clearly unreasonable for the jury to find Derrick guilty of complicity to murder by conspiring with Fess or otherwise aiding, counseling, encouraging, or attempting to aid in the commission of the crime. KRS 502.020(2)(a).

**2. Trial court properly instructed the jury on complicity to murder.**

For their second contention of error, Fess and Derrick argue the jury instructions were inconsistent with the indictment. Specifically, they contend the indictment charged them with conspiracy to murder, a Class B felony, instead of complicity to murder, a Class A felony. Thus, they assert the trial court erred by instructing the jury on complicity. We agree with the Commonwealth that Fess and Derrick are mistaken about the character of the indictment.

Fess and Derrick concede this issue is unpreserved for review and request palpable error review. RCr[9] 10.26 authorizes an appellate court to review an unpreserved error as follows:

---

[9] Kentucky Rules of Criminal Procedure.

15

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

A palpable error is "easily perceptible, plain, obvious, and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). To demonstrate manifest injustice, a party must show the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). In other words, a palpable error occurs where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4.

As the Commonwealth notes, Fess and Derrick both tendered proposed instructions on complicity to murder. Typically, this Court will refuse to address alleged defects in the jury instructions under the invited error doctrine where the defendant proposed an instruction "virtually identical to the one given by the trial court." *Rudd v. Commonwealth*, 584 S.W.3d 742, 746 (Ky. 2019). Here, however, the issue is not confined merely to the propriety of a given instruction; it is whether the complicity instruction permitted Fess and Derrick to be convicted of an uncharged crime. We have long considered such an error to be jurisprudentially intolerable and thus subject to palpable error review. *Caretenders, Inc. v. Commonwealth*, 821 S.W.2d 83, 86 (Ky. 1991).

Count 1 of the indictment against Fess charged as follows:

On or about the 2nd to the 4th day of April 2020, in Harlan County, Kentucky, the above-named defendant committed the offense **Murder, KRS 507.020,** by participating in a conspiracy pursuant

16

> to which Wilmer Perez was shot and killed by one Destiny Stamper[.]

Count 1 of the indictment against Derrick was identically worded.

The law "has long been settled . . . that a 'conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy.'" *Fulton v. Commonwealth*, 849 S.W.2d 553, 555 (Ky. App. 1992) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 789 (1946)). Indeed, while Kentucky law recognizes criminal conspiracy as a standalone offense; for the purposes of complicity, "[t]he conspiracy merely constitutes the factual basis supporting the agency relationship which imposes criminal liability[.]" *Tribbett v. Commonwealth*, 561 S.W.2d 662, 663 (Ky. 1978). In other words, "'complicity' is not a separate crime; rather, it is a means by which a crime may be committed." *Smith v. Commonwealth*, 370 S.W.3d 871, 873 n.1 (Ky. 2012). Further, under KRS 502.020(1)(a) and (2)(a), accomplice liability may be properly imposed where a person engages in a conspiracy which results in a completed offense.

While the indictments in the present matter could have perhaps been more precisely worded, we read the pertinent language to have unmistakably charged Fess and Derrick as accomplices in the completed offense of murder under KRS 507.020 by means of participation in a conspiracy whereby Stamper shot and killed Perez. The indictment charged that Fess and Derrick were guilty of murder "by participating in a conspiracy." Guilt by complicity through participation in a conspiracy is distinct from a charge that a defendant committed the crime of conspiracy. In other words, the act of conspiracy

17

provided the factual basis by which Fess and Derrick were complicit in the completed offense of murder. *See Tribbett*, 561 S.W.2d at 663. Thus, the trial court did not instruct the jury on an uncharged crime. The rule in Kentucky is that "the indictment and jury instructions need not be perfectly matched so long as they describe the same offense: 'If the guts are there the feathers are inconsequential.'" *Johnson v. Commonwealth*, 105 S.W.3d 430, 443 (Ky. 2003) (quoting *Maddox v. Commonwealth*, 349 S.W.2d 686, 693 (Ky. 1961)).

Moreover, we cannot conclude that Fess and Derrick were seriously misled by the indictment to their prejudice despite numerous references to a charge of "conspiracy to commit murder" on various docket sheets and other documents throughout the present record. Notably, neither Fess nor Derrick moved for a bill of particulars. The trial court read both indictments to the jury at the conclusion of voir dire without objection or additional discussion. In their opening statements, Fess and Derrick both acknowledged they were charged with murder. Additionally, Fess and Derrick submitted their own tendered instructions on complicity to murder yet they did not submit any proposed instructions on conspiracy as a standalone offense. Ultimately, when a defendant claims a prejudicial variance from the terms of the indictment, it is the language contained in the body of the indictment that controls. *Johnson*, 105 S.W.3d at 445. Thus, we perceive no error, much less palpable error, pertinent to the instruction on complicity.

## 3. Trial court properly instructed on lesser-included offenses of murder.

18

Fess and Derrick next argue the trial court erred by instructing the jury on the lesser-included offenses of complicity to second-degree manslaughter and complicity to reckless homicide over their objection. We disagree.

The trial court originally agreed to strike the instructions on these lesser-included offenses at the request of Fess and Derrick, and the Commonwealth voiced no objection. However, the trial court subsequently reconsidered, and informed the parties, over Fess and Derrick's objection, that it would instruct the jury on complicity to second-degree manslaughter and complicity to reckless homicide.

RCr 9.54(1) imposes a duty upon the trial court "to instruct the jury in writing on the law of the case[.]" The law of the case encompasses "every state of the case deducible or supported to any extent by the testimony[,]" including lesser-included offenses and any available affirmative defenses. *Hargroves v. Commonwealth*, 615 S.W.3d 1, 6 (Ky. 2021) (quoting *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999)). Thus, "[t]he jury instructions must be complete and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions." *Hayes v. Commonwealth*, 870 S.W.2d 786, 788 (Ky. 1993). "It follows that the giving of an instruction on lesser-included offenses when the evidence would permit a jury to rationally find a defendant guilty of the lesser-included offense and acquit him of the greater offense is not erroneous, *even if given over the defendant's objection*." *Smith v. Commonwealth*, 737 S.W.2d 683, 688 (Ky. 1987) (emphasis added).

19

In *Commonwealth v. Wolford*, 4 S.W.3d 534, 538-39 (Ky. 1999), we further explained,

> [t]his is not an issue of first impression. For over one hundred years, the rule has been that when the defendant testifies to facts showing how the killing occurred and where there is no room for any possible theory except that he is guilty of murder or he is innocent, there is no reason for the court to instruct the jury on lesser offenses; but when the evidence is entirely circumstantial and only establishes the corpus delicti and other circumstances from which the defendant's connection with the crime might be inferred, the jury should be instructed on all degrees of homicide and, if there is evidence of a struggle, on self-defense.

The basis of this well-established rule is our recognition that "even though a jury may legitimately find intent to cause death from actions of which death is a natural and probable consequence, it is not always *required* to so find." *Smith*, 737 S.W.2d at 688 (emphasis added). "Even when death is a natural and probable consequence of an act, there may exist circumstances which make it reasonable for the jury not to be convinced beyond a reasonable doubt that the defendant intended to cause death." *Id.* Consequently, "the jury can rationally convict a defendant of a lesser-included offense and acquit him of the greater offense of intentional murder." *Id.*

In the present appeal, the circumstances surrounding Perez's death were disputed and obscure. There was no physical evidence, and no body was produced. Neither Fess nor Derrick testified and both relied upon a general denial of the charged offenses. While Stamper's testimony concerning the shooting of Perez was highly suggestive of intentional conduct on the part of Fess and Derrick, it was by no means definitive, particularly with respect to

20

their respective states of mind. Stamper also stated Fess told her the events leading up to Perez's death began with a confrontation over a robbery that "just got out of hand."

Based on this evidence, we are convinced the jury could have reasonably found Fess and Derrick guilty of complicity to second-degree manslaughter[10] upon a finding that they wantonly caused Perez's death. Likewise, the evidence supported the instruction on reckless homicide[11] because the jury could have rationally found Fess and Derrick guilty of recklessly causing Perez's death. Therefore, the trial court properly instructed the jury on these lesser included offenses despite the objections of Fess and Derrick.

**4. Derrick invited error pertaining to definition of complicity.**

Derrick also argues the jury instruction on complicity to murder failed to conform to the evidence. Because the trial court determined the jury could only be instructed on a complicity to the result theory under KRS 502.020(2), Derrick argues the instructions were defective because the definition of complicity contained the word "commanded" which only pertains to complicity to the act under KRS 502.020(1).[12] He concedes this argument is unpreserved and requests palpable error review.

At the conference on the instructions, the trial court informed the parties that it would only instruct on complicity to the result as to Derrick to which he

---

[10] KRS 507.040.

[11] KRS 507.050.

[12] As to Fess, the trial court determined the evidence warranted instructions on both complicity to the act and complicity to the result.

21

replied, "I'm fine with the instruction, Judge, but we too would like any lesser-includeds removed." Further, Derrick's tendered instruction on complicity to murder also contained the word "commanded," the phrasing on which he now predicates error. Thus, we conclude Derrick has invited any error in this regard and waived appellate review. *Rudd*, 584 S.W.3d at 746.

## 5. Trial court did not abuse its discretion by allowing witness to hold a stuffed animal.

Next, Fess and Derrick argue the trial court erred by permitting Stamper to hold a stuffed animal during her testimony. Specifically, they argue the use of this item improperly bolstered Stamper's testimony and otherwise unfairly portrayed her as an innocent child. We disagree.

On the morning of the second day of trial, the parties discussed various preliminary matters with the court outside of the presence of the jury. At one point, Derrick inquired into the purpose of a stuffed animal[13] that was placed on either the bench or the witness chair.[14] To the amusement of the parties and court personnel, the trial court quipped, "That's mine, it's a comfort thing for me." Derrick responded that was fine if it was for the trial court, but he objected to Stamper being permitted to hold the stuffed animal during her testimony. The trial court stated, "It's not a prop, if it makes her comfortable. You know, people carry those things on airplanes, and they end up carrying

---

[13] In their respective briefs, Fess and Derrick continue to refer to the item as a stuffed animal while the Commonwealth variously describes it as a toy or stuffed animal. From our review of the record, we cannot discern any additional defining characteristics and thus accept the parties' terminology.

[14] The object in question was not visible on the video record at this time.

22

little dogs and pets on airplanes . . . to ease any stress." The trial court further offered "to explain to the jury it's just a stress reliever." Fess and Derrick then asked for their objections to be preserved for the record.

As a general matter, Kentucky trial courts possess "the inherent authority and discretion to control the decorum and conduct of those in the courtroom to ensure that neither the defendant nor the Commonwealth is denied a fair trial." *Allen v. Commonwealth*, 286 S.W.3d 221, 230 (Ky. 2009) (citing *State v. Speed*, 961 P.2d 13, 29-30 (Kan. 1998)). KRE 611(a) pertains specifically to the examination of witnesses and provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to:
>
> > (1) Make the interrogation and presentation effective for the ascertainment of the truth;
> >
> > (2) Avoid needless consumption of time; and
> >
> > (3) Protect witnesses from harassment or undue embarrassment.

"This provision *requires* 'reasonable control' by the trial judge over these matters and *identifies* objectives that the judge must pursue in exercising that control, namely ascertaining truth, conserving time, and protecting witnesses from harassment or undue embarrassment." Robert G. Lawson, *Kentucky Evidence Law Handbook* § 3.20[1][b] (2023). Because "[m]odern litigation creates a wide variety of problems related to interrogation of witnesses, production of evidence, and general trial management," trial judges are given "broad discretion . . . to deal with problems and situations associated with the

production of evidence." *Disabled American Veterans, Dept. of Kentucky, Inc. v. Crabb*, 182 S.W.3d 541, 550-51 (Ky. App. 2005) (quoting *Lawson*, at § 3.20 [2], 238 (4th ed. 2003). The "test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Fess and Derrick cite *Brown v. Commonwealth*, 983 S.W.2d 513 (Ky. 1999), as controlling authority for the proposition an adult witness[15] should not be permitted to hold a prop while testifying. We perceive *Brown* to be distinguishable from the present appeal.

In *Brown*, we held it was reversible error to bolster the credibility of a witness by allowing the witness to hold a Bible while testifying. *Id.* at 516. Our conclusion resulted from an analysis of the proper use of character evidence under KRE 404(a) and KRE 608. *Id.* at 515. The crux of the matter was that "the effect of [the witness's] testimony while holding a Bible likely served to bolster his credibility with the jury and it did so prior to any attempt by Appellant's trial counsel to impeach [the witness]." *Id.* We further concluded the rules of evidence only permit the bolstering of a witness "in the form of opinion or reputation[.]" *Id.*

Because of its manifest spiritual authority in our culture, the Bible "carries the historical and inherent connotation that one who testifies while

---

[15] We note child victims and witnesses are entitled to various accommodations under KRS 26A.140.

24

holding it is telling the truth." *Jackson v. Commonwealth*, No. 2002–SC–0097–MR, 2003 WL 22415621 at *2 (Ky. October 23, 2003). By contrast, "[t]he presence of a teddy bear, in and of itself, does not emanate truthfulness or bolster a witness's credibility." *Id.* We endorse and adopt the reasoning of the unpublished *Jackson* decision in this respect.[16]

We recognize the jury's determination of Stamper's veracity and credibility was central to the verdict. Under the present circumstances, however, we cannot conclude the trial court abused its broad discretion.

In regard to Stamper's age and the nature of her testimony, she was clearly an adult, being 21 years of age at the time of trial. However, the traumatic events to which she testified occurred when she was 18, and her relationship with Fess began while she was still a minor. We acknowledge that Fess and Derrick dispute the degree of Stamper's culpability and her level of participation in the murder. Regardless, Stamper testified she killed Perez to avoid her own death by Fess's hand. She also testified Fess had previously abused her. Stamper's difficulty in testifying was evident. She immediately began to cry on the witness stand prompting a brief expression of concern from the trial court. Her voice was quavering and low at times, and she broke down as she related the details of Perez's murder. Given the disturbing nature of the crime and the other surrounding circumstances, we have little trouble

---

[16] We could not locate any published Kentucky decisions on this point and rely upon *Jackson* as persuasive, rather than mandatory, authority. *See* Kentucky Rules of Appellate Procedure (RAP) 41(A)(3).

concluding that the use of the stuffed animal assisted with presentation of Stamper's testimony.

Importantly, Stamper's use of the comfort item was unobtrusive. Indeed, as noted above, from our review of the record, we cannot determine with any degree of certainty what type of stuffed animal or toy was used. The item was not visible when Stamper approached the stand and took her oath. It was not clearly visible during her testimony, although at certain times, Stamper was evidently clutching the item on her lap. The stuffed animal was completely visible on the video record for approximately 15 seconds after the conclusion of Stamper's testimony while the parties debated whether she was subject to recall or could be excused. Stamper stood up holding the item and turned to leave through the door immediately adjacent to the witness chair. From this vantage point, the stuffed animal simply appeared to be a blue cushion with purple markings. We cannot discern any disruption or undue focus on its use by Stamper.

Based on our review of the record, we cannot conclude the trial court abused its broad discretion by allowing Stamper to hold a stuffed animal while testifying. The surrounding circumstances amply justified the use of a comfort item, and the exposure of the item to the jury was minimal. We do not perceive any indication the use of this item was calculated to cause, or did in fact result in, any undue prejudice to Fess and Derrick.

**6. References to prior bad acts did not amount to palpable error.**

Fess and Derrick next argue the trial court improperly allowed various references to prior bad acts in violation of KRE 404(b). Neither of their claims are properly preserved and they request palpable error review.

The general rule is well-established "that evidence of other crimes is not admissible to show that a defendant is a person of criminal disposition." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 333 (Ky. 2023) (citing KRE 404(a)). However, such evidence may be admissible when offered for a purpose other than criminal predisposition "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or . . . [i]f so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(1)-(2). "The admissibility of evidence under KRE 404(b) is evaluated under a three-part test: (1) relevance; (2) probativeness; and (3) prejudicial effect." *Gasaway*, 671 S.W.3d at 334.

Fess argues the trial court improperly allowed Stamper to testify that he was "dangerous" and had previously placed his hands on her thus implying physical abuse. He further contends it was improper for the Commonwealth to elicit testimony suggesting that Fess and Stamper engaged in an age-inappropriate relationship. We disagree.

In murder cases, we have previously permitted reasonable inquiry into the dynamics of intimate relationships between co-defendants provided there is a sufficient connection between the relationship and the charged criminal

27

conduct. *Murray v. Commonwealth*, 399 S.W.3d 398, (Ky. 2013); *Chumbler v. Commonwealth*, 905 S.W.2d 488 (Ky. 1995). Here, the charge of complicity to murder was based on the allegation that Fess forced Stamper to kill Perez by threatening to shoot her if she refused. In his opening statement, Fess attacked Stamper's credibility by declaring "she was charged with murder as a co-defendant." Because Fess and Stamper each participated in Perez's murder, their respective states of mind were similarly relevant to the ultimate issue of Fess's guilt. Thus, the nature of their personal relationship, including prior acts of violence, was relevant to explain the development of their criminal relationship.

Evidence of prior bad acts "is sufficiently probative if the trial judge believes 'the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts.'" *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997)). The probative value of evidence is distinct from issues pertaining to its weight and credibility. *Ross*, 531 S.W.3d at 476. Here, Stamper's direct testimony that she credited Fess's threat to kill her based on prior abuse in their relationship and her observations of his explosive temper was sufficiently probative. Any additional lack of explanatory detail is a question of weight and credibility, not of probative value.

KRE 404(b) evidence "is, of course, prejudicial to [the defendant] as all evidence of culpability is in a criminal proceeding." *Luna v. Commonwealth*, 460 S.W.3d 851, 873 (Ky. 2015). However, the pertinent inquiry is not whether

28

such evidence is merely prejudicial but whether it is "*unduly* prejudicial because it is not unnecessary or unreasonable." *Id.* (footnote omitted). Indeed, "[t]he prejudice must go beyond that which is merely detrimental to a party's case and be of such character that it 'produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose.'" *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022) (quoting *Lawson*, at § 2.25[3][d], at 135 (4th ed. 2003)). We have little difficulty concluding the probative value of Stamper's testimony in this regard outweighed its prejudicial effect. Certainly, "[t]he jury was entitled to see the entire picture, not just the self-serving portion [Fess] sought to reveal." *Murray*, 399 S.W.3d. at 410 (footnote omitted).

For his part, Derrick argues the trial court improperly allowed evidence of his participation in a robbery. Specifically, he contends Sgt. Hensley should not have been permitted to recount Eads's allegation that he and Whitehead were robbing a trailer. Additionally, Derrick asserts Sgt. Hensley should not have been allowed to read the Facebook message that Derrick sent a few days prior to the murder, stating, "I know two good licks. And when I say licks I don't play around like everyone one else. I'm talking some money." Sgt. Hensley clarified that "lick" is a slang term for a robbery. We cannot conclude the admission of this evidence amounted to palpable error.

We perceive the incident at the trailer to have provided relevant background and context to Sgt. Hensley's investigation. Additionally, the evidence was sufficiently probative as the circumstances surrounding this

29

alleged robbery were within Sgt. Hensley's personal knowledge. Further, we cannot conclude Derrick was unduly prejudiced considering Sgt. Hensley's testimony that he did not believe any criminal activity to have occurred.

We also regard the Facebook message to have been clearly relevant to Derrick's motive, opportunity, intent, identity, and plan. *Dooley v. Commonwealth*, 626 S.W.3d 487, 494 (Ky. 2021) ("Motivation and identity thus become the independent, non-propensity bases for offering the evidence, so proof should be allowed, even if the evidentiary foundation depends on speculation to some extent."). The Commonwealth's theory relied on evidence suggesting that Perez's murder directly resulted from a robbery or from Perez's attempt to recover his property following a robbery. Additionally, we deem this evidence to be relevant and necessary for the presentation of "a complete, un-fragmented, un-artificial picture of the crime committed by the defendant, including necessary context, background and perspective." *Major v. Commonwealth*, 177 S.W.3d 700, 708 (Ky. 2005).

Although the message does not specify the intended target of the robberies, we consider the evidence to have been sufficiently probative. The Commonwealth laid the proper foundation for the admission of the evidence and no challenge was made to its authenticity. Moreover, given the close temporal relation to Perez's death, we conclude this evidence could support a reasonable inference that Perez was the target of Derrick's robbery scheme. Here, again, any lack of detail in connection with this evidence goes to the weight rather than the admissibility. Further, because this evidence was

30

clearly relevant to provide necessary context to the charged crimes, we cannot conclude the prejudicial effect outweighed the probative value.

### 7. Trial Court Properly Imposed Court Costs.

Fess and Derrick next argue the trial court erred by imposing court costs in the amount of $140.50 despite their status as indigents. We disagree.

In *Chadwell v. Commonwealth*, 627 S.W.3d 899, 902 (Ky. 2021), we rejected the argument that finding of indigency under the "needy person" standard contained in 31.100 necessarily implies that a defendant is a "poor person" thus exempted from the payment of courts under KRS 23.025. In other words, a defendant "is not deemed to be a 'poor person' who is exempt from court costs, simply because he was determined to be a 'needy person' eligible for the services of a public defender as these determinations have two different statutory standards." *Id.*

"The onus is 'on the part of a defendant to raise and show poverty status.'" *Id.* (quoting *Hall v. Commonwealth*, 551 S.W.3d 7, 23 (Ky. 2018)). In the absence of a specific request and explicit finding relative to whether a defendant qualifies for the exemption under KRS 23A.205, "we cannot say a judgment imposing court costs was 'an illegal sentence' subject to correction on appeal despite its lack of preservation." *Id.* (citing *Spicer v. Commonwealth*, 442 S.W.3d 26, 35 (Ky. 2014)).

Fess and Derrick seek to avoid the holding in *Chadwell* by claiming the trial court had sufficient, independent knowledge of their respective financial situations to exempt them from the payment of court costs. However, this

31

argument is based primarily on findings contained in the trial court's order on bond reduction. In setting the terms of bond, the trial court specifically noted Fess and Derrick did not provide "one iota" of evidence on their financial ability to pay bail and instead relied entirely on their affidavits of indigency for the appointment of counsel. Because a finding of indigency cannot be used to directly prove entitlement to the exemption for court costs in the absence of an explicit request for a determination of status as a "poor person," we likewise hold a finding of indigency cannot indirectly be used as proof in this regard.

Derrick further argues the trial court had knowledge he was a state inmate on other charges at the time of sentencing in this case. While the record does contain evidence of Derrick's prior imprisonment, there is no indication this information was presented in the context of a request for a financial determination under KRS 23A.205.

Here, the trial court expressly imposed court costs without finding, implicitly or explicitly, that either Fess or Derrick was a "poor person" under KRS 23A.205. Moreover, neither Fess nor Derrick made any request for such a determination. Thus, reversal is unwarranted because the imposition of court costs was facially valid under *Chadwell*.

## 8. No Cumulative Error Occurred.

Finally, Fess and Derrick argue their convictions should be reversed under the cumulative error doctrine. We disagree.

The cumulative error doctrine provides that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to

32

render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992)). Further, "[w]here . . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citing *Furnish v. Commonwealth*, 95 S.W.3d 34 (Ky. 2002)). A criminal defendant "is guaranteed a fair trial[,]" but "[t]his does not mean, however, a perfect trial, free of any and all errors." *McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). In the present appeal, we fail to discern any multiplicity of errors that would render the joint trial fundamentally unfair.

## CONCLUSION

Accordingly, we affirm the judgment of the Harlan Circuit Court in No. 2023-SC-0125-MR and No. 2023-SC-0135-MR.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Nickell, JJ., concur. Lambert, J., concurs in part and dissents in part by separate opinion, in which Thompson, J., joins.

LAMBERT, J., CONCURRING IN PART AND DISSENTING IN PART: Respectfully, while I concur with much of the majority, I must dissent as to the holding that it was not error to permit the adult shooter to hold a stuffed animal as she testified. Stamper, who admittedly shot the victim, was permitted to hold a stuffed animal as she testified. While I do not think this

33

error was reversible, we should not endorse the use of "comfort items" which could easily be abused by witnesses in an attempt to bolster credibility and/or convey youthful innocence or vulnerability. This holding, will lead to further use of such devices in attempts to garner sympathy from the jury. Thus, I must dissent from such theatrics before a jury.

Thompson, J., joins.


COUNSEL FOR APPELLANT FESS POLLY:

Steven J. Buck
Assistant Public Advocate

COUNSEL FOR APPELLANT DERRICK POLLY:

Jennifer Wade
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General